*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0027P (6th Cir.)
File Name: 04a0027p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MOHAMMAD REZA
DANESHVAR,

       *Petitioner,*

    *v.*

JOHN ASHCROFT, Attorney
General of the United States,

       *Respondent.*

No. 02-3653

On Appeal from the Board of Immigration Appeals.
No. A72 174 409.

Argued: October 23, 2003

Decided and Filed: January 20, 2004

Before: KENNEDY and GIBBONS, Circuit Judges;
ALDRICH, District Judge.*

---

*The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

---

## COUNSEL

**ARGUED:** Behzad Ghassemi, E. Lansing, Michigan, for Petitioner. Lyle D. Jentzer, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent. **ON BRIEF:** Behzad Ghassemi, E. Lansing, Michigan, for Petitioner. Ethan B. Kanter, Michael P. Lindemann, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Respondent.

KENNEDY, J., delivered the opinion of the court, in which ALDRICH, D. J., joined. GIBBONS, J. (pp. 23-30), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

KENNEDY, Circuit Judge. This case presents an appeal from the Board's order denying Petitioner's application for asylum and denying his petition for adjustment of status. We grant but stay the enforcement of the order denying the application for asylum. We reverse the Board's denial of his petition for adjustment of status and remand that petition for further proceedings.

## BACKGROUND

Petitioner is a thirty-nine-year-old native and citizen of Iran, born on March 25, 1964. He was admitted to the U.S. on June 17, 1994 as a visitor. Petitioner violated his non-immigrant status by overstaying his visa, and as a result, was placed in deportation proceedings. On October 19, 1995, Respondent ordered Petitioner to show cause why it should

not deport him for remaining in the United States longer than authorized by his visa. Appearing before an immigration judge, Petitioner admitted the factual allegations in the order to show cause and conceded deportability. Petitioner asked for asylum, withholding of deportation, and, in the alternative, for voluntary departure.

In the aftermath of the Iranian Revolution (after the Shah was overthrown and the U.S. hostages were taken, but prior to their release), Petitioner, who was 16 years old at the time, became attracted to the Mujahedin-e Khalq Organization (MEK) in the city of Ghom.[1] The Department of State describes MEK as follows:

> Formed in 1960s by the college-educated children of Iranian merchants, the MEK sought to counter what it perceived as excessive Western influence in the Shah's regime. Following a philosophy that mixes Marxism and Islam, has developed into the largest and most active armed Iranian dissident group. Its history is studded with anti-Western activity, and, most recently attacks on the interests of the clerical regime in Iran and abroad. . . . Worldwide campaign against the Iranian Government stresses propaganda and occasionally uses terrorist violence. During the 1970s the MEK staged terrorist attacks inside Iran and killed several US military personnel and civilians working on defense projects in Tehran. Supported the takeover in 1979 of the US Embassy in Tehran.

Press Release, Dep't of State, Background Information on Foreign Terrorist Organizations (Oct. 8, 1999), *at* http://www.state.gov/s/ct/rls/rpt/fto/2801.htm#mek, J.A. at 22. MEK is a terrorist group currently designated by the

---

[1] This Court takes judicial notice of the fact that *today* Ghom is a city of approximately 800,000 people located 100 miles southwest of Tehran (pop. 8 million).

Secretary of State as a Foreign Terrorist Organization under INA section 219. Press Release, Dep't of State, 2001 Report on Foreign Terrorist Organizations (Oct. 5, 2001), *at* http://www.state.gov/s/ct/rls/rpt/fto/2001/5258.htm. Petitioner's stated reason for affiliating was the religious nature of the organization that corresponded with his personal upbringing. Petitioner asserts that he was never a formal member of MEK. However, he distributed flyers in support of an MEK senatorial candidate[2] and sold MEK's newspapers. He personally only knew about 15 MEK members (the organization at the time had thousands of members). J.A. at 400. Petitioner discontinued his association with MEK approximately a year later, upon his discovery that MEK began resorting to violence. Petitioner was arrested in Ghom, a year later as part of the widespread campaign by the Islamic government against MEK. He was charged with possession of a gun and a hand grenade during a demonstration and sentenced to life in prison after a thirty-

---

[2] There was a confusion during Petitioner's testimony about what type of an election he participated in. Petitioner did explicitly clarify that he was mistaken when he first said he participated in a Presidential election and that he, indeed, participated in a Senatorial race. Dissent emphasizes that this inconsistency further supports the IJ's adverse credibility finding. We disagree. For the purposes of his asylum claim, it was irrelevant what type of the election he participated in. And as we explain later in this opinion, an adverse credibility judgment cannot be based on an irrelevant inconsistency. On the other hand, for the purposes of his petition for adjustment of status (which was not even filed at the time of his testimony), the distinction between a Presidential and a Senatorial election is significant because, even today, we know nothing about the platform of the Senatorial candidate in question. Whereas it would be fair to impute the beliefs of a national party (like MEK) to its Presidential candidate, we have seen enough diversity in viewpoints among the legislators of the same party in this country to doubt that every MEK Senatorial candidate shared the same viewpoint as the MEK organization itself.

minute trial in front of a Court of Islamic Justice.[3] Petitioner vigorously denies these accusations and maintains that he was arrested on a trumped-up charge designed to punish him for his earlier affiliation with MEK.[4] Originally given a life sentence, Petitioner was released on probation after serving five years in various Iranian jails. He completed his probation without any major accidents, served in the army for two years, and was able to obtain some employment. Petitioner testified that the Iranian government did not allow him to complete his high school education and barred him from ever working for the government. There is no evidence to contradict that testimony.

In March of 1994, Petitioner, through the assistance of a family friend, secured a passport and an exit permit. He traveled to Germany and stayed with a sister there for three months prior to obtaining a visitor's visa to enter the U.S. Petitioner came to the U.S. on June 17, 1994. His immediate family in the U.S. includes his mother, two brothers and one sister, all of whom are either U.S. citizens or permanent

---

[3]The State Department Report stated that:

Defendants tried in the Revolutionary Courts are not granted fair trials. They are often held in prolonged pretrial detention without access to attorneys, and their attorneys are rarely afforded sufficient time to prepare their defense. Defendants are often indicted for such vague offenses as "moral corruption," "antirevolutionary behavior," and "siding with global arrogance." Defendants do not have the right to confront their accusers or the right to appeal. Summary trials of 5 minutes are common, and some trials are conducted in secret.

DEP'T OF STATE, 104TH CONG., COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1995 1154 (Joint Comm. Print 1996).

[4]This Court does not have before it any evidence that led to Petitioner's conviction in Iran. We do, however, note that it is a common occurrence for the Iranian government to arrest "persons on trumped-up criminal charges when their actual 'offenses' are political." DEP'T OF STATE, 104TH CONG., COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1995 1154 (Joint Comm. Print 1996).

residents. He is a beneficiary of an approved immediate relative visa petition filed by his U.S.-citizen sister on September 13, 1998. He is currently employed.[5] Based on this approved visa petition, Petitioner is now eligible to apply to adjust his status and to become a permanent resident of the U.S.

After hearing all testimony, the immigration judge, on February 18, 1997, denied his asylum, withholding, and voluntary departure applications. The immigration judge found that (1) Petitioner lacked credibility based upon his demeanor, lack of responsiveness, and contradictions within his testimony and between his testimony and his application for asylum, (2) Petitioner's claimed fear of persecution was "considerably weakened" by his own testimony, including his statements that his life sentence was reduced to five years, that he successfully completed a subsequent five-year probation, that he was able to find employment, and that he completed his military service without incident, (3) Petitioner has not suffered past persecution, did not have a well-founded fear of future persecution, and thus was ineligible for either asylum or withholding of deportation, and (4) Petitioner would not be granted asylum as a matter of discretion even assuming statutory eligibility because of Petitioner's support for MEK's tough policy toward the American hostages, and his "raising of funds to support and further these policies" during "a critical period in the detention of the hostages." *Daneshvar*, No. A72-174-409 (Feb. 18, 1997) (decision of the IJ).

Petitioner appealed to the Board on March 24, 1997. During the pendency of the appeal, on May 23, 2001, he filed a motion to "reopen/remand" for consideration of his

---

[5]In the Application to Register Permanent Resident or Adjust Status, Petitioner is listed as a medical biller. J.A. at 100. During the oral argument, Petitioner's counsel indicated that Petitioner is currently employed as a physical therapist.

application for the discretionary relief of adjustment of status under INA section 245. On May 13, 2002,[6] the Board affirmed the immigration judge's deportation order and asylum and withholding denials, denied Petitioner's motion to reopen and to remand to apply for adjustment of status, and dismissed the appeal. The Board agreed with the immigration judge's credibility determination, noting that her finding is given significant weight due to her observational advantages. The Board also agreed with the immigration judge's denial of asylum and withholding, finding that even if Petitioner's testimony regarding political imprisonment were true, "conditions in Iran have changed to such an extent that he no longer has a well-founded fear of being persecuted in that country." *Daneshvar*, No. A72-174-409, slip op. at 2 (BIA May 13, 2002). The Board also agreed that it was appropriate to deny Petitioner asylum in the exercise of discretion based upon his past involvement with MEK. Finally, the Board denied Petitioner's motion to remand the proceedings to allow him to apply for adjustment of status. The Board observed that Petitioner was inadmissible under 8 U.S.C. § 1182(a)(3)(B)(i)(I) for having engaged in terrorist activity, including solicitation for membership in the MEK. The Board concluded that the record provided "little apparent positive factors in this case" and that the motion should also be denied "in the exercise of discretion." *Daneshvar*, No. A72-174-409, slip op. at 3 (BIA May 13, 2002).

## ANALYSIS

Petitioner presents four issues on this appeal. First is whether Petitioner was deprived of his constitutional right to a full and fair asylum hearing due to questionable translation by the interpreter where the IJ based her adverse credibility determination on Petitioner's testimony. Second is whether the adverse credibility determination made by the IJ and

---

[6] The record is silent as to why the Board took over 5 (five) years to decide Petitioner's appeal.

affirmed by the Board is erroneous and not supported by the record. Third is whether the Board's decision denying Petitioner's application for asylum and withholding of deportation is manifestly contrary to the law, an abuse of discretion and not supported by the record. Fourth is whether the Board's decision denying Petitioner's motion to reopen to apply for adjustment of status (permanent residency) based on the provisions of 8 U.S.C. §1182(a)(3)(B)(i)(I) is erroneous, an abuse of discretion and not supported by the record.

1. **Constitutional Right to a Full and Fair Asylum hearing.**

Petitioner argues that non-responsiveness and evasion noted by the IJ in his testimony was due to failure of the interpreter at the hearing on February 5, 1997 to adequately communicate with either Petitioner or the IJ. Petitioner relies on this Court's earlier finding that an asylum applicant whose testimony was subjected to questionable translation by an interpreter was deprived of his constitutional right to a full and fair asylum hearing where the IJ grounded his adverse credibility solely on the applicant's testimony. *Amadou v. INS*, 226 F.3d 724 (6th Cir. 2000). We review *de novo* the Board's legal determinations. *Hamama v. INS*, 78 F.3d 233, 235 (6th Cir. 1996).

In *Amadou*, this Court was confronted with a situation where the asylum petitioner and the interpreter spoke different dialects of a West African language, Fulani. *Amadou*, 226 F.3d at 725. The immigration judge in that case found that Amadou was not credible, citing several inconsistencies in his testimony. *Id.* The Board agreed with the immigration judge. This Court, however, noted that both the immigration judge and the Board were on notice that there was a problem with the interpreter. *Id.* at 727. The Court went on to say that the "record indicates that the interpreter's faulty translation directly prejudiced Amadou because the judge and Board denied his application based on the testimony at the hearing." *Id.* The Court concluded that since

"[t]he immigration judge based her decision to deny Amadou's applications for asylum, withholding of deportation, and voluntary departure solely on her determination that Amadou's responses were not credible" and since "the Board of Immigration Appeals deferred to the judge's adverse credibility finding...Amadou was denied his right to a full and fair hearing..." *Id* at 728.

Respondent argues that Petitioner's claim is legally irrelevant because the Board denied asylum and withholding, even assuming the truth of Petitioner's testimony, because he failed to demonstrate a well-founded fear of persecution. Since, as discussed below, we agree that the Board correctly denied asylum on the basis that Petitioner failed to demonstrate a well-founded fear based on present conditions in Iran, we do not address here Petitioner's argument that inadequate translation caused the adverse credibility ruling.

## 2. Adverse credibility determination

Petitioner next argues that a detailed review of the record would not support an adverse credibility determination made by the Immigration Judge and affirmed by the Board. Although we think that Petitioner may have a valid claim that the IJ's adverse credibility determination was erroneous, we nevertheless choose not to resolve this issue because we are satisfied that Petitioner failed to establish that he has a well-founded fear of persecution. Since on remand BIA will exercise its discretion in whether to grant Petitioner's motion to reopen, we note that a blind acceptance[7] of the IJ's adverse

---

[7]As Judge Cole noted in an earlier case:
I see it as particularly important that the IJs put their adverse credibility determinations on the record. Such a record would enable us to conduct a more effective, and even more efficient, review and it would allow us to determine if an IJ's or the BIA's inferences are reasonable. Other circuits require that specific reasons be given for a determination that a witness is not credible, and I also view such a practice as desirable.

credibility findings in this particular case is unwarranted in light of the questionable quality of the interpreters, and that these findings should be reexamined before forming a basis for a discretionary ruling.[8] *See, e.g., Abadi v. INS*, 2002 WL 31856127, at *2 (9th Cir. 2002) (granting a petition of an Iranian asylum seeker and remanding to BIA after observing that "Moreover, 'untrue statements by themselves are not reason for refusal of refugee status.'"); *Garrovillas v. INS*, 156 F.3d 1010, 1013 (9th Cir. 1997) (quoting *Tucious v. INS*, 821 F.2d 1396, 1400 (9th Cir. 1987) (finding error in the BIA's adverse credibility determination where the petitioner's application stated that he had been shot at, but the petitioner testified at his hearing six years later that he had never been shot at)). "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000) (noting that the adverse credibility finding will not be upheld unless the IJ or BIA specifically explains the significance of the discrepancy) (quoting *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986)). *See also Bandari v.*

---

*Ahmad v. INS*, 1998 WL 415975, at *4 (6th Cir. 1998) (Cole, Jr., J., concurring)

[8]For example, the ALJ based her adverse credibility determination, in part, on the testimony about the number of brothers that Petitioner has. According to the ALJ, "[t]he respondent testified that he had three brothers. His own brother testified that the respondent had six brothers." *Daneshvar*, No. A72-174-409, slip op. at 16 (Feb. 18, 1997) (decision of the IJ). In fact, when Petitioner was asked how many relatives he had in Iran, he answered that he had one. J.A. at 385. And when he was asked how many family members lived in the United States, he answered that he had two brothers and a sister. *Id.* Petitioner's brother testified that there were seven brothers altogether (he also said that Petitioner was unrelated to one of them). J.A. at 423-24. Instead of attempting to reconcile the discrepancies, the ALJ simply, and unjustifiably, assumed that there was an inconsistency between the two testimonies. We disagree. Since he has at least one sister living in Germany, it is entirely possible that Petitioner has three brothers who live outside of the United States and Iran.

*INS*, 227 F.3d 1160, 1166 (9th Cir. 2000) (granting a petition from an Iranian applicant and remanding to BIA for a discretionary ruling on the grant of asylum and withholding of deportation after noting that "[a]ny alleged inconsistencies in dates that reveal nothing about a petitioner's credibility cannot form the basis of an adverse credibility finding."); *Zahedi v. INS*, 222 F.3d 1157, 1168 (9th Cir. 2000) (finding that IJ's adverse credibility finding was not supported by substantial evidence in a case of an Iranian applicant for asylum, in part, because it was "clear that there were significant communication and translation problems concerning dates during the asylum hearing.").

### 3.  Asylum claim

A deportable alien is eligible to seek asylum at the discretion of the Attorney General upon proof of a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."   8 U.S.C. § 1158(b); 8 U.S.C. § 1101(a)(42)(A).   A well-founded fear must be both subjectively genuine and objectively reasonable. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998) (stating that "[a]n applicant must therefore actually fear that he will be persecuted upon return to his country, and he must present evidence establishing an objective situation under which his fear can be deemed reasonable.") (citations omitted).  The applicant need not, however, show "that he probably will be persecuted if he is deported; one can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." *Id.* (citations omitted).  This Court has held that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Id.* at 390.  This Court reviews the Board's denial of asylum and withholding of deportation

under the substantial evidence standard.  *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992).

Petitioner argues that his five-year imprisonment from 1981 to 1986 in Iran establishes that he suffered past persecution, giving rise to the presumption under 8 C.F.R. § 208.13(b) that he possesses a well-founded fear of persecution making him eligible for asylum.  Respondent argues that even if the claim of imprisonment is assumed to be credible, a preponderance of the evidence establishes that since Petitioner's imprisonment, conditions in Iran have changed enough to where he no longer has a well-founded fear of being persecuted in that country on the basis of his past involvement with MEK.  8 C.F.R. § 208.13(b)(1)(i)(A).  We agree with Respondent.

As Petitioner testified, his original life sentence was eventually reduced to five years. He thereafter served for two years in the Iranian military without any incidents. Between 1986, when he was released, and 1994, when he left Iran, he was only questioned four times and was never physically mistreated during these encounters with the government. Petitioner was also able to obtain employment, although his options were limited by his inability to work for the government.[9]  Petitioner strenuously argues that the human

---

[9] Economic deprivation constitutes persecution only when the resulting conditions are sufficiently severe. *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985). *See also Tarevski v. INS*, 1994 WL 276886, at *2 (6th Cir. 1994) (citing *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990) (reviewing decisions from several circuits and holding that one's inability to obtain his preferred government job is not sufficient evidence to establish persecution)); *Youssefinia v. INS*, 784 F.2d 1254, 1261 (5th Cir. 1986) (in a case involving an Iranian applicant for asylum, observing that "[w]hile Youseffinia argues that a *total* withdrawal of all economic opportunity may support a well-founded fear of persecution, he has not met the burden of proof for such a showing. The record indicates that Youssefinia's brothers have obtained employment and are able to support the family. . .Youssefinia's status upon return would be closer to his brothers' than to his father's.")

rights conditions in Iran have continuously deteriorated, citing country reports published by the U.S. Department of State. Although we accept as true the allegations of widespread human rights abuse by the Iranian government, we are nevertheless constrained by the statute to reject Petitioner's claim for asylum because he failed to show a well-founded fear of persecution based on *his political opinion*. *See, e.g., Hamzehi v. INS*, 64 F.3d 1240, 1244 (8th Cir. 1995) ("We agree with the Hamzehis that, by our standards, today's living conditions in Iran are inhospitable or worse for women and those who would prefer a different political order. However [petitioners] have not shown the sort of particularized threat of severe harm that would support a well-founded fear of persecution."); *Ahmadi v. Board of Immigration Appeals*, 1992 WL 114386, at *3 (4th Cir. 1992) ("We have no doubt that the conditions and human rights in Iran are deplorable. The Act, though, does not provide asylum eligibility for anyone who may be subject to violence in his home country.") (citations omitted). We understand that many Iranian citizens may live in fear of persecution by the Islamic regime. However, the statute requires them to either be members of a particular race, religion, nationality, or social group, or to have the fear based on a political opinion. If we were to accept Petitioner's theory of eligibility for political asylum, we would have to hold that every Iranian citizen has a well-founded fear of persecution *solely* by virtue of living in Iran. Petitioner has enjoyed as close to a normal life during his eight years in Iran after his release, as can be expected of a person living in a totalitarian Islamic state. He has presented no credible evidence that he will be singled out for different treatment if he is deported back to Iran. As the Board explained in an earlier opinion:

> This Board in turn appreciates the awful circumstances in which the Sri Lankan Government and large numbers of the inhabitants of that country find themselves. But if we were to accept the applicant's assessment of human rights violations as constituting persecution under the Act, Tamils, Moslems, and Sinhalese alike would all be

> persecuted in Sri Lanka. *Neither the relief of asylum nor of withholding of deportation provides for refuge on account of human rights abuses unconnected to the grounds enumerated in the Act, i.e., race, religion, nationality, membership in a particular social group, or political opinion.*

*Matter of T*, 20 I&N Dec. 571, 577 (BIA Oct. 13, 1992) (citations omitted) (emphasis added).

### 4. Withholding of Deportation

The United States Code provides that "[t]he Attorney General shall not deport any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1253(h)(1). As this Court has previously noted, "[a]n application seeking withholding of deportation faces a more stringent burden of proof than one for asylum." *Mikhailevitch*, 146 F.3d at 391 (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431-32 (1987)). Because substantial evidence supports the Board's determination that Petitioner is ineligible for asylum, it therefore follows that he cannot satisfy the more stringent standard for withholding of deportation.

### 5. Motion to Reopen

The Attorney General, may in his discretion, adjust the status of an alien "to that of an alien lawfully admitted for permanent residence if (1) the alien makes an application for such adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed." 8 U.S.C. § 1255(a). As the Supreme Court noted, the abuse-of-discretion standard applies to the judicial review of the Board's determination of motions to reopen. *INS v.*

*Abudu*, 485 U.S. 94, 96 (1988). The Board's discretion is broad but it is not unlimited. It may not exercise its discretion in a way that is arbitrary, irrational or contrary to law. *Babai v. INS*, 985 F.2d 252, 255 (6th Cir. 1993) (quoting *Mejia-Carrillo v. INS*, 656 F.2d 520, 522 (9th Cir. 1991)). Cursory, summary, or conclusory statements are inadequate. *Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 97 (2nd Cir. 2001). As this Court has explained:

> In determining whether the Board abused its discretion, this court must decide whether the Board's decision was made without a rational explanation, inexplicably departed from established policies or rested on an impermissible basis, such as invidious discrimination. . . The scope of review is exceedingly narrow because a lack of statutory standards provides the Attorney General with unusually broad discretion. At least two courts have held that it is only necessary that the Board hear, consider and rationally decide the case before it. . . Nevertheless, the BIA may be reversed if it fails to actually consider the facts and circumstances respecting each petitioner's claim of extreme hardship. . . Such a decision would be reversed as arbitrary or capricious.

*Hazime v. INS*, 17 F.3d 136, 140 (6th Cir. 1994) (citations omitted). Finally, the Board's denial of relief may be affirmed only on the basis articulated in the decision and this Court may not assume that the Board considered factors that it failed to mention in its opinion. *See, e.g., Casem v. INS*, 8 F.3d 700, 702 (9th Cir. 1993); *Anderson v. McElroy*, 953 F.2d 803, 806 (2nd Cir. 1992).

The Board disposed of Petitioner's motion to reopen to apply for adjustment of status in the following manner:

> Due to his participation in these same activities, we will deny the respondent's motion to remand proceedings to apply for adjustment of status. Although he has an approved visa petition based on his relationship to his

> sister, the respondent is inadmissible to the United States under section 212(a)(3)(B)(i)(I), for having engaged in terrorist activity. Engagement in terrorist activities includes solicitation for membership in terrorist organization. Section 212(a)(3)(B)(iii). As noted above, the MEK is designated as a terrorist organization under section 219 of the Act. . . Therefore the respondent is inadmissible on this ground. Further, the record provides very little apparent positive factors in his case and leads us to conclude that the request should be denied in the exercise of discretion.

*Daneshvar*, No. A72-174-409, slip op. at 3 (BIA May 13, 2002). We find that (1) the Board erred as a matter of law in its statutory analysis and (2) that it abused its discretion in rejection Petitioner's motion to reopen by failing to adequately consider all relevant factors.

Section 1182 of Title 8 defines various categories of inadmissible aliens. 8 U.S.C. § 1182. One of those categories is involvement in terrorist activities. 8 U.S.C. § 1182(a)(3)(B). The Board confined its analysis to the provision that provides that any alien who has engaged in a terrorist activity is ineligible to receive a visa and ineligible to be admitted into the United States. 8 U.S.C. § 1182(a)(3)(B)(i)(I). The Immigration Judge and the Board held that MEK was a terrorist organization because it was so designated by the State Department. We agree that *today* MEK is a designated terrorist organization. However, MEK was not designated as a terrorist organization at the time of Petitioner's involvement. The importance of this distinction is explained below.

The Board found Petitioner to be statutorily ineligible for "solicitation for membership in a terrorist organization."[10] *Daneshvar*, No. A72-174-409, slip op. at 3. We review questions of statutory interpretation *de novo* but with due deference to the interpretation by the Attorney General and the Board. *Fieran v. INS*, 268 F.3d 340, 344 (6th Cir. 2001) (citing *INS v. Aguirre Aguirre*, 526 U.S. 415, 424 (1999); *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). The statute does prohibit solicitation of any individual for membership in a terrorist organization described in clauses (vi)(I) or (vi)(II). 8 U.S.C. § 1182(a)(3)(B)(iv)(V)(aa) and (bb). Those clauses deal with an organization that is designated as a "terrorist organization" either under §1189 or by the Secretary of State. *Id.* As discussed above, MEK was not a "terrorist organization" at the time of Petitioner's conduct under either clause.[11]

---

[10] On remand, the Board should explain in what way Petitioner's conduct constituted "solicitation of membership." We see no evidence in the record to indicate that Petitioner actually attempted to convince anyone to become a member of the MEK.

[11] Our reading is consistent with the Congressional intent as illustrated by the following Note that accompanied the amendments to the statute:

Notwithstanding paragraphs (1) and (2), *no alien shall be considered inadmissible* under section 212(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1182 (a)(3)) [subsec. (a)(3) of this section]...by reason of the amendments made by subsection (a) [amending this section], *on the ground that the alien engaged in a terrorist activity* described in subclause (IV)(bb), (V)(bb), or (VI)(cc) of section 212(a)(3)(B)(iv) of such Act (as so amended) [subclause (IV)(bb), (V)(bb), or (VI)(cc) of subsection (a)(3)(b)(iv) of this section] *with respect to a group at any time when the group was not a terrorist organization* designated by the Secretary of State under section 219 of such Act (8 U.S.C. 1189) or otherwise designated under section 212(a)(3)(B)(vi)(II) of such Act (as so amended) [subsect. (a)(3)(B)(vi)(II) of this section].

8 U.S.C. § 1182 note para. (3)(A) (2001) (Retroactive Application of Amendments).

The statute does also provide that a terrorist organization is a "group of two or more individuals, whether organized or not, which engages in the activities described in subclause (I), (II), or (III) of clause (iv)." 8 U.S.C. § 1182(a)(3)(B)(vi)(III).[12] Based on the evidence in the record, we think that BIA was correct in finding that MEK was a terrorist organization during the 1970s as defined by §1182(a)(3)(B)(vi)(III).[13] Petitioner's solicitation for membership in a clause (vi)(III) terrorist organization, however, only renders him ineligible if he cannot "demonstrate that he did not know, and should not have

---

[12] As the Note to 8 U.S.C. § 1182 explains:
Subparagraph (A) shall not be construed to prevent an alien from being considered inadmissible or deportable for having engaged in a terrorist activity...described in subclause (IV)(cc), (V)(cc), or (VI)(dd) of section 212(a)(3)(B)(iv) of such Act (as so amended) [subclause (IV)(cc), (V)(cc), or (VI)(dd) of subsec. (a)(3)(B)(vi)(III) of such Act (as so amended) [subsec. (a)(3)(B)(vi)(III) of this section].
8 U.S.C. § 1182 note (2001) para. (3)(B) (Retroactive Application of Amendments).

[13] Because it is unnecessary for our ultimate disposition of the case, we do not decide whether MEK's behavior during the Iranian hostage crisis amounted to a terrorist activity within the meaning of § 1182(a)(3)(B)(vi)(III). Nor do we decide whether or not such a determination is necessary. We merely note a certain degree of ambiguity in the statute that the parties may wish to consider on remand. A "terrorist activity" is defined as an activity that would be unlawful, *inter alia*, in the United States if it had been committed in the United States, and that involves, *inter alia*, taking hostages. 8 U.S.C. § 1182(a)(3)(B)(iii). The term "engage in terrorist activity" is defined, *inter alia*, as incitement "to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv)(I). It is therefore unclear whether or not an act that would qualify as "engage in terrorist activity" must at the same time be unlawful in the United States. In other words, the question is whether MEK's conduct during the hostage crisis, which is clearly in violation of 8 U.S.C. § 1182(a)(3)(B)(iv)(I), ought to be evaluated in light of the more speech-friendly First Amendment standard articulated by the Supreme Court in *Brandenburg v. Ohio*, 395 U.S. 444 (1969).

reasonably have known, that the solicitation would further the organization's terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv)(V)(cc). We find that the Board committed a legal error when it failed to consider Petitioner's evidence regarding his state of mind.

Petitioner, at the age of 16, supported one of the numerous organizations that came to life in the aftermath of the Iranian Revolution. We would be hard-pressed to classify any minor who sold newspapers for an organization that supported an armed revolt against a tyrannical monarch as a terrorist. To impute such political sophistication to a teenager that apparently even the U.S. Congress failed to achieve,[14] in our minds, would amount to a manifest injustice. Furthermore, we are persuaded that Petitioner's voluntary disassociation from MEK merely a year after he joined it, is evidence that he did not originally know in what MEK was involved. Finally, Petitioner testified during the hearing before the IJ that he was unaware of MEK's violent activities until the time he left the group.[15] There is no evidence that Petitioner himself engaged in any violent acts of terrorism. Thus, there is substantial evidence that Petitioner is not statutorily ineligible for immigration relief. The burden then shifts to Respondent to

show otherwise. Since Petitioner's affiliation with MEK was very brief, Respondent's burden will be a heavy one. We note that the Board was under the misapprehension that Petitioner remained a member of MEK until he was imprisoned, and was unaware that Petitioner had actually disassociated himself from MEK upon learning of MEK's violent conduct a full year prior to his arrest. Respondent, and the Board, relied on the 1996 State Department Report that stated: "[a]lthough the Mojahedin now deny a role in that crisis, they advocated a tough hostage policy in several issues of their own official newspaper "Mojahed," published in Persian in Tehran in 1980-81." DEP'T OF STATE, BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR, IRAN–PROFILE OF ASYLUM CLAIMS & COUNTRY CONDITIONS (June 1996), J.A. at 171. Ordinarily, we defer to the executive branch in matters affecting immigration. However, in light of the significant factual and legal mistakes committed by the Board in this case, as detailed above, we find that no such deference is warranted and that Respondent failed to establish that Petitioner knew or reasonably should have known about MEK's activities.

Respondent also defends the Board's decision on the grounds that the Board did not abuse its discretion when it found that "the record provide[d] very little apparent positive factors in this case and leads us to conclude that the request should be denied in the exercise of discretion." *Daneshvar*, No. A72-174-409, slip op. at 3. We disagree.

We find a number of factors in the record that may cause the Board to find that Petitioner's motion to reopen should be granted.[16] First, the Board inexplicably took 5 (five) years to

---

[14] As Petitioner notes in his brief, a number of U.S. Congressmen opposed the designation of MEK as a terrorist organization. *See, e.g., U.S. v. Rahmani*, 209 F. Supp.2d 1045, 1050-51 (C.D. Cal. June 21, 2002). *See also National Council of Resistance of Iran v. Department of State*, 251 F.3d 192, 208-09 (D.C. Cir. 2001) (holding that the process by which MEK was designated as a terrorist organization violated MEK's due process rights by not allowing it to present "such evidence as [it] may be able to produce to rebut the administrative record or otherwise negate the proposition that [it is a] foreign terrorist organization.")

[15] Petitioner lived in Ghom, away from the center of the hostage crisis. Freedom of the press did not exist in Iran. It is unlikely that he was aware of all of the events going on around the country during the volatile period in question. Petitioner's brother also testified that MEK changed its public position so many times during the relevant period that it was impossible to know what it actually advocated. J.A. at 418.

[16] In its opinion, the Board implies, without explicitly stating, that Petitioner was involved with MEK during the time of the murder of the U.S. citizens. We want to emphasize that the murder of the U.S. citizens took place prior to Petitioner's involvement with the MEK and there is no evidence produced by Respondent to suggest that Petitioner was aware of those murders.

decide his appeal. *See generally Casem v. INS*, 8 F.3d 700, 702-03 (9th Cir. 1993) (reprimanding BIA for failure to consider the effect of a five-year delay on the petitioner's son); *Rodriguez-Barajas v. INS*, 992 F.2d 94, 97 (7th Cir. 1993) (noting "unconscionable" seven-year delay between petitioner's appeal and BIA's decision); *Saywack v. Attorney General*, No. 91 Civ. 7797, 1993 WL 205121, at *1 (S.D.N.Y. June 9, 1993) (discussing BIA's series of "lengthy and unexplained delays.") Therefore, Petitioner has now been in this country for almost ten years. One should hesitate before uprooting him after such a long delay. Second, Petitioner has a number of his immediate family members in this country, including his mother, a sister, and two brothers, all of whom are either U.S. citizens or permanent residents. *See, e.g., Casem*, 8 F.3d at 703 (noting the special regard that Congress has for keeping families intact). Third, the record indicates that the immediate members of Petitioner's family have become productive members of this society and Petitioner himself is currently employed. Fourth, Petitioner was an immature teenager when he was associated with MEK; he lived in a country known for its suppression of all political activity at the time of high political turmoil; he was not in Tehran at the time of the Iranian hostage crisis; and he quit MEK as soon as he found out about its violent activities. Fifth, and last, although we found that Petitioner has not established a valid claim for political asylum, we nevertheless cannot ignore the ramifications of sending a man to what can only best be described as a lawless country.

## CONCLUSION

For the reasons stated above, we find that Petitioner is ineligible for an asylum and/or withholding of deportation. However, we stay the enforcement of the Board's order as it relates to asylum and/or withholding of deportation because we find that the Board committed reversible legal error and abused its discretion in denying Petitioner's motion to reopen his application for adjustment of status. Accordingly, we reverse the Board's order denying Petitioner's motion for

adjustment of status and remand for proceedings consistent with this opinion.

## CONCURRING IN PART, DISSENTING IN PART

JULIA SMITH GIBBONS, Circuit Judge, concurring in part and dissenting in part. I agree with the majority's conclusion to affirm the decision of the Board of Immigration Appeals with respect to denying Daneshvar's petitions for asylum and withholding of deportation. Daneshvar has failed to satisfy the statutory requirements for these forms of relief.

I disagree, however, with the majority's decision to reverse and remand the BIA's order denying Daneshvar's motion to reopen for adjustment of status. While the majority is correct that Daneshvar is not inadmissible to the United States for soliciting membership in a terrorist organization, as that term is defined at 8 U.S.C. § 1182(a)(3)(B)(vi)(I), the definition of terrorist organization relied on by the BIA, Daneshvar is nonetheless inadmissible for soliciting membership in a terrorist organization, as defined at 8 U.S.C. § 1182(a)(3)(B)(vi)(III). *Compare* 8 U.S.C. § 1182(a)(3)(B)(vi)(I) (defining terrorist organization as an organization "designated under section 1189 [8 U.S.C. § 1189]" by the Secretary of State) *with* 8 U.S.C. § 1182(a)(3)(B)(vi)(III) (defining terrorist organization as "a group of two or more individuals, whether organized or not, which engages in the activities described in subclause (I), (II), or (III) of clause (iv) [such as committing or preparing a terrorist activity or gathering information on potential targets for terrorist activity]"). Furthermore, even if Daneshvar is not deemed inadmissible under either definition of terrorist organization, it was not an abuse of discretion for the Board to deny Daneshvar's motion to reopen for the reasons stated in the Board opinion – Daneshvar's involvement with the MEK "at a time when it was particularly strong in its opposition to the United States" and the existence of few positive factors in support of granting the motion.

As the majority explained, this court reviews the BIA's denial of a motion to reopen for abuse of discretion. *Ashki v. INS*, 233 F.3d 913, 917 (6th Cir. 2000). This court has described review under an abuse of discretion standard in the following manner:

Abuse of discretion is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary manner, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error in judgment in the conclusion it reached upon a weighing of the relevant factors. There is no exact measure of what constitutes abuse of discretion. It is more than the substitution of the judgment of one tribunal for that of another. Judicial discretion is governed by the situation and circumstances affecting each individual case. Even where an appellate court has power to review the exercise of such discretion, the inquiry is confined to whether such situation and circumstances clearly show an abuse of discretion, that is, arbitrary action not justifiable in view of such situation and circumstances.

*Balani v. INS*, 669 F.2d 1157, 1160-61 (6th Cir. 1982) (internal quotation and citation omitted). In reviewing the BIA's decision to deny a motion to reopen, as the majority notes, "this Court must decide whether the denial of Petitioner's motion to reopen deportation proceedings was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Id.* at 1161.

The Supreme Court has commented that the Attorney General has "broad discretion" to grant or deny a motion to reopen. *INS v. Doherty*, 502 U.S. 314, 323 (1992) (citing *INS v. Rios-Pineda*, 471 U.S. 444, 449 (1985)). Furthermore, "[m]otions for reopening of immigration proceedings are

disfavored for the same reasons as are petitions for rehearing and motions for a new trial on the basis of newly discovered evidence." *Id.* "This is especially true in a deportation proceeding, where, as a general matter, every delay works to the advantage of the deportable alien who wishes merely to remain in the United States." *Id.*

The BIA denied Daneshvar's motion to reopen his deportation proceedings by finding that he is inadmissible to enter the United States under 8 U.S.C. § 1182(a)(3)(B)(i)(I) for having engaged in terrorist activity and because "the record provides very little apparent positive factors in his case." The BIA did not abuse its discretion in making this determination.

I agree with the majority that the MEK was a terrorist organization, as defined by § 1182(a)(3)(B)(vi)(III), during the 1970s. In a decision refusing to set aside the State Department's designation of the MEK as a foreign terrorist organization in the 1990s, the D.C. Circuit described the MEK's activities in the years just prior to Daneshvar's involvement:

The MEK "collaborated with Ayatollah Khomeini to overthrow the former Shah of Iran. As part of that struggle, they assassinated at least six American citizens, supported the takeover of the U.S. embassy, and opposed the release of American hostages." "[In 1972] the MEK exploded time bombs at more than a dozen sites throughout Tehran, including the Iran-American Society, . . . and the offices of Pepsi-Cola and General Motors. From 1972-75 . . . the Mojahedin continued their campaign of bombings, damaging such targets as the offices of Pan-American Airlines, Shell Oil Company, and British organizations."

*People's Mojahedin Org. of Iran v. United States Dep't of State*, 182 F.3d 17, 20 (D.C. Cir. 1999) (quoting a CIA Intelligence Research Paper dated July 1993) (alterations in

original). The U.S. State Department characterizes the MEK's violence in this way:

During the 1970's [sic], the Mojahedin organization was at the forefront of opposition to the Shah and in this period assassinated several Americans in Iran. The Mojahedin was in full support of the takeover of the US embassy and the holding of our hostages during the 1979-81 hostage crisis in Iran. Their own published statements show that their anti-US position at that time was much more hard-line than that of Iran's leaders. Although the Mojahedin now deny a role in that crisis, they advocated a tough hostage policy in several issues of their own official newspaper "Mojahed," published in Persian in Tehran in 1980-81.

Iran – Profile of Asylum Claims and Country Conditions, June 1996, Dept. St. Report, at 5. Title 8 U.S.C. § 1182(a)(3)(B)(i)(I) provides that an alien who has engaged in terrorist activity is inadmissible to the United States. To "engage in terrorist activity" means *inter alia* "to solicit any individual for membership in a terrorist organization described in clause (vi)(III) [8 U.S.C. § 1182(a)(3)(B)(vi)(III)], unless the *solicitor* can demonstrate that he did not know, and should not reasonably have known, that the solicitation would further the organization's terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv)(V)(cc) (emphasis added).

By Daneshvar's own admission, his involvement with the MEK was by no means a passive pursuit. In his testimony before the immigration court, Daneshvar stated that from around 1978 or 1979 until 1980 or 1981 he sold the Mojahed, the MEK newspaper that the State Department has stated advocated support for the taking of American hostages, supported the MEK's ideology, and was "active" in the MEK's election efforts. Daneshvar also testified that he was part of a twenty member committee that produced and

distributed flyers in support of MEK political candidates.[1] Therefore, the entire focus of Daneshvar's involvement with the MEK – according to his own testimony – was aimed at soliciting individuals for membership in this terrorist organization.

Since Daneshvar's actions constitute solicitation of membership in a terrorist organization, he is inadmissible to the United States unless he demonstrates that he did not know, and should not reasonably have known, that his acts of solicitation would further the MEK's terrorist activities. Daneshvar has wholly failed to meet this burden. While the majority, citing factors such as Daneshvar's age at the time of participation and his solicitation over a one year period of time, concludes that "there is substantial evidence that Petitioner is not statutorily ineligible for immigration relief," these factors do not demonstrate Daneshvar's *knowledge*, or lack thereof, concerning the contribution that his activities made to the organization's terrorism efforts. The statute does not craft an exception for persons that solicit membership in terrorist organizations based on the solicitator's age or duration of action. Rather, the statute only exempts persons under 8 U.S.C. § 1182(a)(3)(B)(iv)(V)(cc) for reasonably lacking the knowledge that their efforts contributed to the organization's terrorist activities.

The majority also claims that Daneshvar learned of the MEK's violent aims around the time that he left the organization. On this point, Daneshvar testified, "at the time

---

[1] Interestingly Daneshvar first testified that he was part of a committee aimed at electing the MEK's presidential candidate. He later recanted this testimony, stating that he "didn't participate in the election of the president, but in the election of the Senate." Inconsistencies such as this instance belie the doubt expressed by the majority that the immigration judge erred in adversely assessing Daneshvar's credibility. Regardless of which candidate Daneshvar supported, however, his active participation with the MEK's political operations bolsters the conclusion that he solicited membership in the organization.

Mojahedin and my friend were talking to go against the government with our force. And at the time, I find out if we go that it will like [sic] bloody war in the country. Right before when they take the guns out, I separated from them." Again, this evidence does not demonstrate that Daneshvar was unaware that his actions furthered the MEK's terrorist activities. This testimony, if believed, only leads to the conclusion that Daneshvar left the MEK when he felt the organization was about to confront the Iranian government. Daneshvar's testimony does not indicate that he lacked knowledge of the MEK's terrorist activities prior to his departure from the group.

Furthermore, even if this court were to believe that Daneshvar did not know the effects of his solicitation for the MEK, declaring Daneshvar inadmissible to the United States would nonetheless be appropriate. The statute requires the solicitor to demonstrate both that he lacked actual knowledge that his solicitation would further the organization's terrorist activities and that he should not reasonably have known of the effects of his solicitation. As previously discussed, during the very period that Daneshvar solicited members on behalf of the MEK in the late 1970s and early 1980s, the organization's own newspapers proclaimed the MEK's support for the holding of American hostages. Therefore, it is extremely difficult to accept that Daneshvar should not have known he was soliciting members for a terrorist organization, when he willingly distributed literature proclaiming the organization's violent policies.

Although the majority initially states correctly that the burden for demonstrating Daneshvar's lack of knowledge concerning the effect of his solicitation rests on him, the majority ultimately places this burden on the INS by remarking that "Respondent failed to establish that Petitioner knew or reasonably should have known about MEK's activities." The statute clearly places the burden on the *solicitor* – Daneshvar, in this case – to demonstrate that he "did not know, and should not reasonably have known, that

the solicitation would further the organization's terrorist activity." 8 U.S.C. § 1182(a)(3)(B)(iv)(V)(cc). Examining evidence offered by the INS is irrelevant to this court's consideration of whether Daneshvar solicited individuals for membership in the MEK.

Finally, the majority opinion lists several factors, such as Daneshvar's length of stay in the United States, in an attempt to provide positive factors the Board could have used as justification for granting Daneshvar's motion to reopen. While this court could consider these factors if applying *de novo* review to this issue, under an abuse of discretion standard of review, this court cannot substitute its judgment for that of the Board. *Balani*, 669 F.2d at 1162 ("Congress has entrusted to the Attorney General of the United States the responsibility of exercising discretion in immigration matters. The Courts will not substitute their discretion for that of the Attorney General.").

Therefore, I disagree with the majority's apparent conclusion that Daneshvar is not inadmissible to the United States. Nevertheless, even if one were to decide that Daneshvar was not inadmissible through his involvement with the MEK, it is important to note that the Board also based its decision to deny Daneshvar's motion on his participation in the MEK during the precise time that the organization not only opposed American interests but also "argu[ed] for a prolongation of the detention of the hostages." In addition, the Board concluded that there were "very little apparent positive factors" that favored granting Daneshvar's motion in the exercise of the Board's discretion. In its decision, which upheld the denial of Daneshvar's petitions for asylum and withholding of deportation as well as denied Daneshvar's motion to reopen, the BIA also cited the immigration judge's finding that Daneshvar lacked credibility because of his demeanor during testimony and inconsistencies

within his testimony.[2] Consequently, the Board did not abuse its discretion – even if Daneshvar was not statutorily inadmissible to the United States – in deciding to deny his motion to reopen. I dissent from the majority's decision to reverse the BIA's order denying Daneshvar's motion to reopen and to remand for proceedings consistent with the majority opinion.

---

[2] While concluding that review of Daneshvar's claim that the immigration court erred in making an adverse credibility determination about him is unnecessary, the majority nevertheless says that Daneshvar "may have a valid claim that IJ's adverse credibility determination was erroneous." The majority also creates a possible explanation, not supported by the record, for one of Daneshvar's inconsistent statements. Although we do not resolve this issue, my reading of the record provides no basis to question the credibility finding of the immigration judge. The immigration judge, who – unlike the present panel – had the opportunity to witness first-hand the testimony of all the witnesses as well as the demeanor exhibited by Daneshvar, pointed to six separate instances of inconsistent testimony and also based the adverse credibility finding on Daneshvar's demeanor and nonresponsiveness. Since the majority does not undertake review of the immigration judge's credibility determination, its construction of hypothetical explanations for Daneshvar's apparent inconsistencies is superfluous. In addition, the development of such explanations is inconsistent with our deferential appellate role in this context.