NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name:  08a0733n.06
Filed:  December 2, 2008

No. 07-3418

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SHELSEY SUSAN SCAVENGER, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW OF AN |
| | ) | ORDER OF THE BOARD OF |
| MICHAEL B. MUKASEY, | ) | IMMIGRATION APPEALS |
| | ) | |
| Respondent. | ) | |

Before:  GILMAN, SUTTON, and KETHLEDGE, Circuit Judges.

SUTTON, Circuit Judge.  Shelsey Scavenger, a native and citizen of Canada, challenges a decision of the Board of Immigration Appeals (BIA) denying her applications for asylum, withholding of removal and relief under the Convention Against Torture.  For the reasons that follow, we deny the  petition for review.

I.

From 1996 to 1999, Scavenger, formerly named Susan Falls, lived in British Columbia and worked as a bus driver for the City of West Vancouver transit system.  At some point during her tenure there, she determined that a number of customers were not paying their bus fares, and she brought this problem to the attention of management and eventually to the public.  In May 1999, the

transit system fired her for insubordination. Claiming that her criticism of the company's fare-collection practices improperly prompted the discharge, Scavenger filed an arbitration action against the transit system in an attempt to get her job back. She eventually settled the claim for 27,500 Canadian dollars but was not reinstated.

During the next four years, Scavenger had difficulty finding long-term employment. She received unemployment benefits for the first year after she lost her job, but for reasons that the record does not disclose she apparently was not eligible for these benefits after that year and apparently was never eligible for welfare. She supported herself with "odd jobs," JA 91, one of which included a year-long government grant "to start a recycling business," JA 62—what became a form of "dumpster div[ing]" by which she would collect bottles, among other items, for recycling, JA 92. But she never found long-term employment, and by 2003 she was "living in [her] car and living with friends," JA 63. Scavenger entered the United States for the first time in 2003, and she entered the country in July 2004 with the hopes of staying here permanently.

Scavenger applied for asylum, withholding of removal and relief under the Convention Against Torture, claiming economic deprivation because her public employer had "blacklisted" her and because "four levels of government in Canada" had "persecuted" her "economically" due to her views about fare collection. JA 91. The Immigration Judge (IJ) denied all of Scavenger's applications. In doing so, the IJ accepted Scavenger's allegations that she was a "whistle blower" who had been "acted against for [her] political opinion." JA 20. But he nonetheless held that, "whatever economic deprivation [Scavenger] was subject to," it did "not rise to the level of

persecution [required] under the Act." JA 32. The BIA affirmed, except in two respects: It found it unnecessary to determine whether the government had acted against her on account of her political opinion, namely her whistle blowing, and it declined to affirm the IJ to the extent he speculated that Scavenger's personality may have affected her inability to find a job.

## II.

### A.

To be eligible for asylum, an alien must prove that she is unable or unwilling to return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). When the BIA largely affirms the IJ's decision without discussion but adds commentary of its own on a few points, we "directly review the decision of the IJ while considering the additional comment[s] made by the BIA." *Gilaj v. Gonzales*, 408 F.3d 275, 283 (6th Cir. 2005). We will reverse the BIA's decision only if the applicant shows "that no reasonable factfinder could fail to find the requisite fear of persecution," *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)—that the evidence in other words "not only *supports* [reversal] but *compels* it," *id.* at 481 n.1.

Scavenger seeks asylum on the ground that she was "persecut[ed]" on the basis of her "political opinion." The alleged persecution stems from economic deprivation caused by the Canadian government's blacklisting of her, and the connection to political opinion turns on the allegation that her employment difficulties arose after she called attention to the Vancouver transit

system's lenient fare-collection practices. Consistent with the BIA's decision, we need not decide whether the government's response to Scavenger's whistle-blowing activities amounted to persecution *on account of political opinion*. We instead need only address whether her difficulties in finding a job amounted to persecution.

Economic deprivation is a two-sided theory of persecution. On the one side, economic persecution is not a traditional ground for seeking asylum, and one can well imagine why. It would seem odd to say that an inability to obtain *public* employment on account of political opinion necessarily constitutes persecution. Otherwise, every patronage firing after every regime change in another country would establish a cognizable basis for an asylum claim in this country. And we doubt that many governments, particularly a country the size of Canada, have the authority to prevent public *and* private employers from hiring someone because of her political opinion. On the other side, it is no doubt the case that a malicious government bent on bringing an individual to heel could do so just as effectively by punishing her economically as by punishing her physically.

The BIA and our court have balanced these considerations by holding that government-caused "economic deprivation" may "constitute[] persecution" but "only when the resulting conditions are sufficiently severe." *Daneshvar v. Ashcroft*, 355 F.3d 615, 624 n.9 (6th Cir. 2004) (citing *In re Acosta*, 19 I. & N. Dec. 211, 222, 1985 WL 56042 (BIA 1985)). As the BIA put the point more recently, while asylum applicants "need not demonstrate a total deprivation of livelihood or a total withdrawal of all economic opportunity in order to demonstrate harm amounting to

persecution," they must establish that they faced a "deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment or other essentials of life." *In re T-Z*, 24 I. & N. Dec. 163, 171, 173 (BIA 2007) (internal quotation marks omitted).

Scavenger cannot show that Canada purposefully imposed "severe economic disadvantage" on her or at least cannot show that the record compels such a finding. Her principal theory of economic persecution is that the Canadian government blacklisted her on a nationwide basis. There is "a list," she stated, "that the Canadian government has of people who should never get jobs" and she was on that "blacklist." JA 61. The problem with this theory is that the IJ did not credit her testimony on this point. "[A]lthough," he explained, "the Court has no problem believing that any time the bus company or the union was asked for a reference, they said bad things about her, as I'm sure that they did. Nonetheless, that does not constitute a nationwide blacklist . . . ." JA 20–21. Scavenger never directly challenged the IJ's credibility finding on this point, and not surprisingly the BIA did not disturb it. Nor is there anything in the record that casts doubt on this conclusion.

That leaves the possibility that, even if the Canadian government did not place Scavenger on a nationwide blacklist, the poor job references that the transit system gave her after the discharge still rose to the level of economic persecution. Putting to one side the question whether our immigration laws provide relief whenever a foreign-government agency refuses to give a positive reference to someone it has discharged, the first signal that Scavenger was not subjected to a cognizable case of economic persecution is her settlement agreement with the Vancouver transit system. That the Canadian legal system permits a discharged public employee to seek legal relief if she has been

treated improperly offers some evidence that our northern neighbor would not lightly engage in economic persecution. And whatever else Scavenger's C$27,500 settlement with the transit system may suggest about the validity of her whistle-blowing claim, it does not suggest that the government was trying to make her penniless. Likewise, had the government been bent on making her impecunious, it would not have supported her with unemployment benefits for a year, and it would not have given her a year-long grant to support her recycling business. The record is silent on why Scavenger's unemployment benefits ended when they did and on why she was ineligible for welfare, if indeed she was, but critically Scavenger never alleges that the government's alleged animosity against her had anything to do with her receipt of or eligibility for these benefits.

Other record evidence supports the denial of this claim. In addition to the C$27,500 she received after her discharge, Scavenger had other ways to support herself during the next four years. She started a dumpster-diving business that collected recyclables that could benefit local charities. No one suggests that she left that business because the government interfered with it; rather, she was "burned out" by it, and it apparently did not generate sufficient income. JA 93. She later worked intermittently cleaning houses and was employed by the Salvation Army during the holiday season. And it bears emphasizing that her arrival in the United States has not markedly changed the kind of work she has been qualified to handle or her standard of living. *Compare* JA 63 ("[T]he last few months I was in Canada . . . I was living in my car and living with friends. . . . I didn't have a job."),

*with* JA 94 (describing the "odd jobs" she has taken in the United States, including "eleven months of house-sitting and living in [her] car," and her current living arrangements, which involve "a cheap, dingy room in a rooming house").

She also refused to look into or accept certain types of employment before she left Canada. Despite her interest in serving the public, she did not apply to any public-interest organizations in Canada. While she offers no credible basis for fearing that the government would have prevented her from working as a waitress, she explained that it "would be last on [her] list of things to do" because she "can't stand to see food thrown away." JA 70. "[O]ne's inability to obtain [her] preferred government job" does not establish persecution. *Daneshvar*, 355 F.3d at 624 n.9. And while she acknowledged that she did not mind cleaning houses, she testified that "there are a lot of people, I think a lot of illegal aliens there that are doing the same thing, so it's not easy to find work there as it is here." IJ Hr'g Tr. 44. Indeed, in her opening brief, she concedes that employment opportunities are available in Canada but she has not pursued them because they are "menial." Br. at 22. Yet one cannot bring a cognizable economic persecution claim merely because a weak economy has undermined one's job prospects or because it has undermined one's preferred job prospects. *See Daneshvar*, 355 F.3d at 624 n.9. All of this suggests not that the government economically persecuted her, but that she was unable to find long-term employment that best suited her. That does not amount to the "deliberate imposition of severe economic disadvantage" by the Canadian government. *In re T-Z*, 24 I. & N. Dec. at 171 (internal quotation marks omitted); *see Daneshvar*, 355 F.3d at 624 n.9 ("Economic deprivation constitutes persecution only when the

resulting conditions are sufficiently severe."); *see also Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir. 1990) (holding that petitioner's complaint that "he could not get a government job commensurate with his education and training . . . did not rise to the level of persecution").

Scavenger insists that the IJ applied the wrong standard for determining economic persecution by requiring her "to prove inability to obtain employment of any kind in Canada" in order to qualify for asylum. Br. at 20. But we do not read the IJ's opinion as imposing such a requirement. He merely "d[id] not find fully credible" one of Scavenger's factual claims—"that she was unable to find any kind of employment anywhere in Canada," JA 20—a statement that goes to the credibility of *Scavenger's* assertion that she could not find *any* employment in the country, not to the showing needed to qualify for asylum.

B.

Having failed to demonstrate that she is eligible for asylum, Scavenger necessarily cannot satisfy the more demanding standard for withholding of removal. *See Yu v. Ashcroft*, 364 F.3d 700, 703 n.3 (6th Cir. 2004). And Scavenger has failed to address in any detail the IJ's rejection of her separate claim for relief under the Convention Against Torture, leaving us no basis for addressing it ourselves. *See Leary v. Livingston County*, 528 F.3d 438, 449 (6th Cir. 2008).

III.

For these reasons, we deny the petition for review.