NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0509n.06
Filed: June 15, 2005

Case No. 02-4023

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SAWSAN MOUSA ASAD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES BOARD OF |
| | ) | IMMIGRATION APPEALS |
| JOHN ASHCROFT, Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

BEFORE:  SILER, BATCHELDER, and DAUGHTREY, Circuit Judges.

ALICE M. BATCHELDER, Circuit Judge.  Petitioner Sawsan Mousa Asad appeals the order of the Board of Immigration Appeals ("BIA") affirming, without opinion, the order of the Immigration Judge ("IJ") denying her petition for asylum and withholding of removal.  Asad also claims that the BIA's summary affirmance procedure is tantamount to a lack of meaningful review in violation of her right to due process under the Fifth Amendment.  Because Asad's due process claim lacks merit, and because we agree with the immigration courts that Asad has not demonstrated past persecution or a well-founded fear of persecution, we AFFIRM the order of removal.

I.

Asad is an ethnic Palestinian who was born in the city of Nablus in the West Bank on October 25, 1966.  At the age of around six months, she fled with her family from Nablus to Kuwait as a result of the 1967 Six-Day War.  In Kuwait, Asad's father obtained employment with Kuwaiti Airlines. Asad's family, including her mother and father, two sisters and two brothers, lived in

Kuwait until 1987. The family never obtained Kuwaiti citizenship or permanent residency status, but they were permitted to live in Kuwait by virtue of her father's employment with the airline, which entitled him to work and residency permits covering the whole family.

In 1987, Kuwait cancelled the work visa of Asad's father and gave the family one month to leave Kuwait. One of Asad's brothers traveled directly to the United States where he later became a citizen by marriage. The rest of the family went to Jordan. Asad and her father stayed in Jordan only about 29 days before traveling to the United States, while her mother, two sisters, and other brother remained in Jordan. Asad has been continuously in the United States since 1987. Her father remained here until approximately 1991, when he returned to Jordan, where he lived until 1994. He returned to the United States after he and Asad's mother were granted permanent residency based on their son's citizenship. Asad's sisters currently reside in Jordan, where her other brother lived until 1998 when he was killed. In 1989, Asad married Hesham Othman, a Jordanian citizen, and they have two daughters who are United States citizens by birth.

Asad originally entered the United States on a non-immigrant visitor visa on August 6, 1987. After she remained here beyond her authorized date, the Immigration and Naturalization Service served her with an Order to Show Cause ("OSC") and initiated removal proceedings. At a hearing before an Immigration Judge ("IJ") in Buffalo on January 10, 1990, at which Asad did not appear, she was ordered deported *in absentia*. Asad subsequently filed a motion to reopen which was granted, and a motion to change venue to Detroit which was also granted. At a hearing before the IJ in Detroit on March 13, 1998, Asad admitted to the factual allegations contained in the OSC, except that she denied being a native and citizen of Jordan, and conceded deportability. She then applied for asylum and withholding of removal, and in the alternative, voluntary departure.

In her application for asylum, Asad indicated that she was seeking asylum on the grounds of nationality and membership in a particular social group. She claims to be a stateless Palestinian stating, "I was born in Palestine, in Nablus on the West Bank, in what became part of Israel in 1967." The OSC listed Asad as a native and citizen of Jordan, but she denied any connection to Jordan insisting that she was not national of Jordan "either by implication or because I somehow swore allegiance or owe allegiance to Jordan." Asad further alleged that she "would be prevented from entering Kuwait and denied admission. As to Jordan, I would not be allowed anything more than a temporary status and not [sic] be allowed to resettle there as I have no ties, no former residency, or no place to go." As for past persecution, Asad stated, "we were driven from 'Israel.' We were driven from Kuwait. Both times involuntarily. Both times forcibly evicted from those countries."

The evidence at the deportation hearing consisted of Asad's written asylum application, her testimony, a State Department Advisory Opinion, country reports for Israel, Kuwait and Jordan, and various exhibits, including her passport, marriage certificate and driver's license. The central issue at the hearing was whether Asad qualified as a citizen or national of Jordan as the government averred or whether she was a stateless Palestinian as she claimed, thereby making Kuwait, the country of her last habitual residence, the relevant country for purposes of her asylum application.

Asad testified that in the twenty years (1967-1987) she lived in Kuwait, she was never arrested, interrogated, questioned, detained, imprisoned, or otherwise abused. Asad claims that she would not be permitted to return to Kuwait without proper documentation, and that if she did return she would be arrested. The 1997 State Department Country Report on Kuwait states that "[t]he

3

Government prevents the return to Kuwait of stateless persons who have strong ties to the country . . . and hundreds of people are being held in detention facilities pending deportation."

On cross-examination, Asad was asked whether she knew that the West Bank was a part of Jordan from 1948 until the 1967 Six-Day War. She denied that the West Bank was ever part of Jordan and stated that she was born in Israel. But the record indicates that Asad's parents were born in Jordan, and Asad carries a birth certificate issued by the "Ministry of Health" of "The Hashemite Kingdom of Jordan." According to documentary evidence submitted by Asad, "Palestinians in the West Bank were under Jordanian rule between 1948 and 1967 following Jordan's annexation in 1950." Asad also testified that she does not think she will be harmed in Jordan, but she stated, "for me as a woman now, it would be hard for me to find a job and even to find a house. What I mean, it's very hard for me to, to support, you know, my family and myself."

Asad also admitted carrying a Jordanian passport that is valid for five years, but she contended that while she is permitted to carry a Jordanian passport, it does not entitle her to any rights. The documentary evidence established that Asad originally obtained a five-year Jordanian passport, and was then issued a renewal five-year passport by the Jordanian Embassy in Washington, D.C., in July 1995. The State Department Advisory Opinion states that "[i]f the applicant's Jordanian passport is of a five year validity, then [she] is either a citizen of Jordan or a person entitled to enter Jordan for permanent residence. Such persons enjoy all the privileges and obligations of citizens of Jordan." The State Department Advisory Opinion indicates that in October 1995 the Jordanian Interior Ministry listed certain categories of persons subject to having their five-year passports replaced with two-year documents, sharply limiting their privileges in Jordan. These groups included residents of the West Bank and Gaza who were determined to have Palestinian

4

nationality by the 1988 decision of King Hussein to disengage from the West Bank. According to the 1997 State Department Country Report for Jordan, King Hussein intervened later in October 1995 to overturn part of the Interior Ministry policy, announcing "that West Bank residents would again be eligible to receive a five-year Jordanian passport. However, the Government has stressed that these passports are for travel only and do not connote citizenship." The evidence established that Asad's renewal five-year passport was issued prior to the October 1995 changes in policy.

At the conclusion of the deportation hearing, the IJ found Asad to be a "very credible person." Nonetheless, with regard to Asad's claims of past persecution, the IJ concluded that neither the forced expulsion out of Israel nor the expulsion of Asad's family out of Kuwait in 1987 were cognizable under the asylum laws. The IJ further found that Asad is a national of Jordan, and that in relation to Jordan, Asad essentially claims that she will have difficulty finding employment and sustaining herself in that country, which does not create a well-founded fear of persecution under the asylum laws. After finding that Jordan was the relevant country for purposes of the asylum analysis, the IJ found it unnecessary to analyze whether Asad has a well-founded fear of returning to Kuwait, the country of her last habitual residence. Accordingly, Asad's claims for asylum and withholding of deportation were denied. Following the IJ's decision, Asad appealed to the BIA, which issued a summary affirmance without opinion on August 20, 2002.

**II**.

We begin by addressing Asad's claim that the BIA's summary affirmance procedures deprived her of due process. We review de novo an alleged due process violation in a deportation hearing. *Mikhailevitch v. INS*, 146 F. 3d 384, 391 (6th Cir. 1998). In 1999, the Department of Justice established a streamlined appellate review procedure for the BIA. At all times relevant to

5

this appeal, the applicable regulation was found in 8 C.F.R. § 3.1(a)(7), although it was later transferred unchanged to 8 C.F.R. § 1003.1(e)(4) as a consequence of the Homeland Security Act of 2002. 68 FR 9824 (Feb. 28, 2003). If an appeal from a decision of the IJ meets the regulation's criteria, the BIA issues an order containing the following statement: "The Board affirms, without opinion, the results of the decision below. The decision below is therefore, the final agency determination." 8 C.F.R. § 3.1(a)(7) (2002). The BIA's decision in this case was made in accord with 8 C.F.R. § 3.1(a)(7) (2002). We recognize that "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). We have, however, explicitly held that the BIA's streamlining procedures do not violate an alien's due process rights under the Fifth Amendment. *Denko v. INS*, 351 F.3d 717, 729-30 (6th Cir. 2003). For the reasons that we articulated in *Denko*, this claim lacks merit.

## III.

We next address the IJ's denial of Asad's applications for asylum and withholding of removal pursuant to Sections 208(a) and 241(b)(3) of the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158(a) and 1231(b)(3). Because the BIA issued a summary affirmance, the IJ's decision is the final agency order, 8 C.F.R. § 3.1(a)(7) (2002), and we therefore review the IJ's decision. *Denko*, 351 F. 3d at 723, 730. When reviewing a decision of the immigration courts, we review only the administrative record on which the order of removal was based, and "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(A) and (B). Moreover, a discretionary decision to deny asylum under 8 U.S.C. § 1158 "shall be conclusive unless manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D).

6

The INA grants the Attorney General the discretionary power to grant asylum to any alien who qualifies as a "refugee" under 8 U.S.C. § 1101(a)(42). 8 U.S.C. § 1158(b)(1). A "refugee" is defined as any person who is unable or unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). It is the alien who bears the burden of proving past persecution or a well-founded fear of future persecution. 8 C.F.R. § 208.13(a); 8 C.F.R. § 208.16(b).

Before analyzing whether Asad qualifies for asylum, it is necessary to determine from which country she can properly seek asylum. Despite Asad's claim that she is not a national of Jordan "either by implication or because I somehow swore allegiance or owe allegiance to Jordan," the IJ concluded that Asad is a national of Jordan. For purposes of the INA, the term "national" means "a person owing permanent allegiance to a state." 8 U.S.C. § 1101(a)(21). Based on the evidence in this record, we cannot say that "any reasonable adjudicator would be compelled to conclude" to the contrary. 8 U.S.C. § 1252(b)(4)(A) and (B).

Asad testified that she was born in the city of Nablus in the West Bank on October 25, 1966. She then presented documentary evidence stating that "Palestinians in the West Bank were under Jordanian rule between 1948 and 1967 following Jordan's annexation in 1950." The record also indicates that Asad's parents were born in Jordan, and Asad submitted a birth certificate issued by the "Ministry of Health" of "The Hashemite Kingdom of Jordan." *See United States v. Ramos*, 840 F.2d 1, 2 (5th Cir. 1988) (stating that a birth certificate is documentary evidence of citizenship for purposes of the immigration laws). Assuming that Jordan follows standard international practice by conferring nationality on grounds of birth in a state's territory (*ius soli*) or birth to parents who

7

are nationals (*ius sanguinis*), then Asad likely has Jordanian citizenship.  On the other hand, courts have determined that a "permanent allegiance" is most easily established by birth.  *See Hughes v. Ashcroft*, 255 F.3d 752, 756 (9th Cir. 2001).  Since Asad was born in Jordan it is not unreasonable to conclude that she owes permanent allegiance to that country.

Asad also admitted carrying a Jordanian passport that is valid for five years.  The State Department Advisory Opinion states that "[i]f the applicant's Jordanian passport is of a five year validity, then [she] is either a citizen of Jordan or a person entitled to enter Jordan for permanent residence.  Such persons enjoy all the privileges and obligations of citizens of Jordan."  Although the State Department Advisory Opinion does indicate that a particular group of *residents* of the West Bank who were determined to have Palestinian nationality as of 1988 now have five-year passports "for travel only," that Asad is included in that group is belied by the record.  Her passport contains no limitation on rights whatsoever and includes this language:  "Government officials of the Hashemite Kingdom of Jordan, representatives abroad and all those whom it may concern are required and requested to allow bearer to pass freely without let or hindrance *and to afford her every assistance and protection of which she may stand in need*."  The final phrase suggests that Asad is entitled to some form of diplomatic protection which is generally limited only to nationals or citizens, and her availment of those protections would suggest that she owes some allegiance to Jordan. *See* IMMLS § 29:54 (The term "'allegiance' is generally defined as the obligation of fidelity and obedience which an individual owes to the government under which she lives *or to her sovereign in return for the protection the individual receives*") (emphasis added).

Moreover, the IJ's determination is also supported by Asad's testimony concerning her family.  Asad's two sisters have lived in Jordan since 1987, where her brother also lived until the

unfortunate incident in which he was killed in 1998. In addition, Asad's mother lived in Jordan from 1988-1994, as did Asad's father from 1991-1994, while they awaited confirmation of their status as permanent residents of the United States. And Asad's husband is a Jordanian citizen. These facts not only contradict Asad's claim that she has "no ties" to Jordan, but they also suggest that the Jordanian passports carried by her family at least confer permanent residency status on the holder. Indeed, documentary evidence submitted by Asad generally describes how Jordan has been the most accepting of any middle eastern state with regard to displaced Palestinians, stating that "[i]n Jordan . . . Palestinians (except for the 1967 refugees from Gaza) have enjoyed citizenship rights since 1948."

Having concluded that the IJ properly considered Asad to be a national of Jordan, we find that the IJ also properly concluded that she may claim asylum only as to Jordan. *See* 8 U.S.C. § 1101(a)(42). But Asad cannot satisfy her burden of establishing either past persecution or a well-founded fear of persecution with respect to Jordan. First, her claims of past persecution at the hands of the Israeli and Kuwaiti governments are not relevant to an asylum claim from Jordan. Second, Asad cannot demonstrate eligibility for asylum on the basis of a well-founded fear of future persecution. She specifically testified that she does not think she will be harmed if she goes to Jordan; she only stated, "for me as a woman now, it would be hard for me to find a job and . . . to support . . . my family and myself." While this statement may evince a subjective fear of returning to Jordan, we have recognized that "[e]conomic deprivation constitutes persecution only when the resulting conditions are sufficiently severe." *Daneshvar v. Ashcroft*, 355 F.3d 615, 625 n.9 (6th Cir. 2004) (citing *Matter of Acosta*, 19 I & N Dec. 211, 222 (BIA 1985) (stating that persecution can "consist of economic deprivation or restrictions so severe that they constitute a threat to an

9

individual's life or freedom")).  Even if Asad could prove that she would be unable to find a job because of her gender or ethnicity, such a claim is not sufficient objectively to establish a well-founded fear of future persecution.  *See Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991) ("Possession of broadly-based characteristics such as . . . gender will not by itself endow individuals with membership in a particular group."); *see also Fanhoun v. Ashcroft*, 2004 WL 1982344, at *2 (6th Cir. Aug. 24, 2004) (Palestinian had no reasonable basis to fear returning to Jordan as possible difficulty in finding work was not enough to establish eligibility for asylum); *Tarevski v. INS*, 30 F.3d 134, at *1 (6th Cir. 1994) (unpublished table decision) (alien's "inability to find a job due to his ethnicity and religion is not the type of persecution which qualifies an alien for asylum.").  Clearly, the IJ's discretionary decision to deny asylum to Asad on this record was not "manifestly contrary to the law and an abuse of discretion."  8 U.S.C. § 1252(b)(4)(D).

While a grant of asylum is discretionary, withholding of removal pursuant to Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3)(A), is mandatory if the applicant can demonstrate that there is a "clear probability" that she would be subject to persecution on account of one of the same five protected bases for establishing asylum. *Castellano-Chacon v. INS*, 341 F.3d 533, 545 (6th Cir. 2003).  But an applicant seeking withholding of removal faces a more stringent burden of proof than one seeking asylum. *Daneshvar*, 355 F.3d at 625.  Because the record and the law supports the IJ's determination that Asad is not eligible for asylum, she necessarily cannot satisfy the more stringent standard for withholding of removal. *Id*.

**IV.**

Despite our holdings, we wish to point out that this case presents unfortunate circumstances. Asad has lived in the United States for nearly 18 years.  Both of her daughters as well as her brother

are U.S. citizens, and her parents are lawful permanent residents. During oral argument, this court also learned that Asad's husband has been granted cancellation of removal, which confers upon him lawful permanent residence status. As a result, we requested the attorney for the government to inquire of the Department of Homeland Security ("DHS") as to whether such a change in circumstances warrants any action, discretionary or otherwise, in Asad's case. DHS has responded that the only way for Asad to obtain adjustment of status based upon her husband's grant of lawful permanent residence status would be to seek a motion to reopen with the BIA, which would be untimely at this juncture because the 90-day filing period has lapsed. 8 C.F.R. § 1003.2(c)(2). While DHS has the discretion to waive the 90-day filing limitation, it has refused to do so. *See* 8 C.F.R. § 1003.2(c)(3)(iii). Consequently, although we are sympathetic to Asad's situation and we believe many of the equities weigh in her favor, and we do not condone the DHS's refusal to exercise its discretion under the circumstances of this case, we are powerless to intervene. Accordingly, we reluctantly **AFFIRM** the orders of the IJ and the BIA denying Asad's claims for asylum and withholding of removal.