**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0526n.06
Filed: August 27, 2008

**No. 07-3609**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SINAN ISAM HANNA, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE BOARD OF |
| | ) | IMMIGRATION APPEALS |
| MICHAEL MUKASEY, | ) | |
| ATTORNEY GENERAL | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

Before:  GIBBONS and SUTTON, Circuit Judges; and ACKERMAN, District Judge.[*]

**ACKERMAN**, District Judge.  Petitioner-Appellant Sinan Isam Hanna appeals the denial

of his motion to reopen asylum proceedings by the Board of Immigration Appeals.  Hanna based

his motion on changed conditions in his native country of Iraq since the denial of his original

asylum application.  Because we find that the record is insufficient for us to engage in a

meaningful review of whether the Board abused its discretion, we will remand for proceedings

consistent with this Opinion.

---

[*] The Honorable Harold A. Ackerman, Senior United States District Judge for the District
of New Jersey, sitting by designation.

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Hanna is a 36-year-old Iraqi national, an Assyrian Christian male, and a member of the Chaldean Catholic Church.[2] Iraq's population is roughly 27 million, with an estimated 97 percent Muslim, and the remaining 3 percent Christian, including Chaldean, Assyrian, Syriac, Armenian, and Protestant.[3] Dep't of State's Iraq Country Report for 2005. It is not entirely clear how many Christians have left Iraq since the war began in 2003, but official estimates place the Christian population in 1987 at 1.4 million, with approximately 750,000 residing in Iraq today. *Id*.

Hanna's original asylum application in January 2003 was based upon the following factual scenario, although the Immigration Judge ultimately denied Hanna's application due to inconsistencies in his testimony. Hanna was born in Iraq and lived there until October 2001. Hanna's father, in May or June 2001, purchased a home in Baghdad from a Shi'a family. Unbeknownst to Hanna's father at the time he purchased the home, the head of that particular

---

[2] The Chaldean Church takes its name from the Ur of Chaldees, an ancient city in the lower Tigris-Euphrates River Valley in the region known as Mesopotamia. In the sixteenth century, the Church of the East–so called because it lay east of the Roman Empire–sought reconciliation with the Church of Rome after a schism many years before. Thereafter, those Christians in union with Rome were known as Chaldeans, whereas other Christians were called Assyrians. The Chaldean Catholic Church is an autonomous eastern rite with its own jurisdiction and under its own patriarch.

[3] Iraq has a very small Jewish community, consisting of 20 people, according to the latest estimate from the Department of State. Hanna, in his brief, puts the Jewish population at 8.

Shi'a family happened to have been a leader of the Al-Dawa party, which operated in opposition to the Ba'athist regime of Saddam Hussein. Apparently, the Al-Dawa leader had fled Iraq in 1998, but returned under a promise of amnesty, only to be executed by Hussein's security police, known as the Amin. Hanna's father did not know about the history of the family that owned the house, and purchased it from the family because it was offered at below market value. When the sale of the home came to the attention of the Amin, Hanna's father was imprisoned for approximately forty days, and tortured based upon the assumption that he was somehow connected to the outlawed, anti-Ba'athist Al-Dawa party. Hanna's father was released only after paying a bribe of 10 million dinar to the Amin. He marshaled the funds for the bribe from his business, which was valued at 14 million dinar. He utilized the remaining 4 million dinar to secure passports and safe passage for him and his wife to Jordan shortly after release.

After Hanna's father and mother escaped Iraq in July 2001, the Amin detained Hanna and his sister, Rasha, in connection with their parents' disappearance from Iraq. The interrogation involved physical abuse, including being punched, kicked, and beaten with a wooden stick. The Amin went to Hanna and Rasha's home on at least two other occasions in August and September 2001 to interrogate the siblings again. Each time, the interrogation lasted about one hour and involved physical abuse. In addition to the physical abuse, the Amin told Hanna that he must join the "Jerusalem Army." According to Human Rights Watch, "[i]n February 2001, President Saddam Hussein announced the formation of a new paramilitary force, the Jaysh al-Quds [Jerusalem Army], with the aim to 'liberate' Jerusalem. Iraqi males of military age, particularly Shi'a and Kurds, were often forced to 'volunteer' for service in the Jaysh al-Quds." *Flight From*

No. 07-3609
*Hanna v. Mukasey*

*Iraq: Attacks on Refugees and Other Foreigners and Their Treatment in Jordan*, Human Rights Watch Report, Vol. 15, No. 4, http://www.hrw.org/reports/2003/iraqjordan/ Iraqjordan0503-03.htm.

Fearing the future facing them in Iraq, Hanna and his sister decided to leave the country. Their father sent money and a driver from Jordan, and Hanna secured a passport and exit permit for himself and his sister through payment of bribes. They fled Iraq to Amman, Jordan, where they resided until June 2002, when they entered the United States. On June 10, 2002, Hanna entered the United States on a non-immigrant K-1 visa, which is more commonly referred to as a "fiancé visa." Hanna came to the country with the alleged intention of marrying his fiancé, an American citizen. His visa required that he either marry his fiancé within 90 days or leave the country. He never married. Instead, on January 13, 2003, Hanna filed an application for asylum in the Chicago immigration office.

On November 18, 2003, an immigration judge ("IJ") found Hanna removable as charged and denied his application for asylum. The IJ found that there were inconsistencies between Hanna's various sworn statements and testimony, as well as inconsistencies between his testimony and that of his witnesses, and that those inconsistencies rendered Hanna and his witnesses not credible. The IJ found, in the alternative, that even if Hanna had been credible, the types of incidents about which he testified–namely the physical abuse at the hands of the Amin–did not establish past persecution sufficient to qualify for discretionary asylum. Finally, the IJ noted that since Hanna filed his application in January 2003, Saddam Hussein and his Ba'ath Party regime had been deposed. The IJ further explained that "there is no government

currently in Iraq other than that proffered by Paul Bremer and the coalition forces." (JA at 241).

Furthermore, "[t]here is no evidence in this record, which establishes that [Hanna] would be

subject to governmental persecution or persecution by someone whom the coalition has

acquiesced in inflicting torture upon [Hanna]." (*Id*.) These facts were important to the IJ

because the changed circumstances in Iraq at the time of the IJ's decision rebutted any belief that

it was "more likely than not that [Hanna] would be tortured should he return to Iraq." (*Id*.)

Hanna timely appealed. On June 2, 2005, the Board of Immigration Appeals (the "BIA")

affirmed the IJ's decision. In reaching its conclusion, the BIA found that the IJ's factual

findings, including her credibility assessment, were not "clearly erroneous."[4] In addition, the

BIA noted that the Ba'ath Party was no longer in power. Furthermore, the BIA held that Hanna's

fears of persecution by "fundamental Islamic groups . . . have not been shown to be objectively

reasonable." (JA at 8.) Nevertheless, the BIA took an extra step and advised Hanna that he

could file a motion to reopen if he had new evidence from reliable sources establishing that his

"fears of being persecuted in current day Iraq *on account of* any protected ground are objectively

reasonable." (*Id*. (emphasis in original).)

Hanna never sought review of the BIA's decision. However, on November 8, 2006,

Hanna filed a motion to reopen his case based upon changed conditions in Iraq. Hanna, as an

Iraqi Christian, essentially argued that conditions for Christians had so deteriorated that sending

---

[4] The IJ also appeared to make an adverse credibility determination as to Hanna based in part
on the fact that Hanna's sister did not appear to testify as scheduled. At oral argument, Hanna's
counsel informed us that Hanna's sister was in a car accident that day and showed up to the hearing
a few minutes late, but the IJ refused to let her testify.

him back to Iraq would be tantamount to a death sentence. On April 17, 2007, the BIA dismissed

Hanna's motion to reopen on the grounds that conditions for Christians had not worsened since

the IJ's decision in November 2003, nor since the BIA's decision in June 2005. In particular, the

BIA held that "we are not persuaded that the documents provided with the motion demonstrate

that conditions for Chaldean Christians in Iraq worsened . . . since [Hanna's] hearing before the

Immigration Judge" or since the BIA's affirmance of the IJ's decision. (JA at 10.) Furthermore,

the BIA explained that "[t]he recency of articles shows that some Chaldean Christians continue

to be targeted in Iraq, but this evidence fails to illustrate a material change, it does not show that

the respondent faces an individualized risk of persecution, and it does not show a pattern and

practice of persecution of Chaldean Christians by the Iraqi government." (*Id.*) Hanna timely

filed a notice of appeal with this Court.

## II. JURISDICTION

In Hanna's jurisdictional statement, he declares that this appeal seeks review of the April

17, 2007 decision by the BIA as well as the June 2, 2005 decision by the BIA. However, in his

"Argument Summary," he advises that he "will focus solely on the denial of the motion to reopen

for changed country conditions." (Hanna Br. at 6.)

This Court has jurisdiction to review only final orders of removal that have been timely

appealed. 8 U.S.C. § 1252(a)(1). The Government concedes that Hanna timely appealed the

BIA's April 17, 2007 decision inasmuch as his petition for review was filed within the thirty-day

requirement on May 14, 2007. *See* 8 U.S.C. § 1252(b)(1). However, to the extent Hanna seeks

review of the BIA's June 2, 2005 decision, the Government contends that his appeal is untimely and cannot be reviewed by this Court.

The Sixth Circuit addressed a similar situation in *Prekaj v. I.N.S.*, 384 F.3d 265, 267 (6th Cir. 2004). There, the Court noted that the petitioner sought review of the IJ's decision, the subsequent decision by the BIA, and the BIA's later decision denying the petitioner's motion to reopen his case. The *Prekaj* Court concluded that it did not have jurisdiction to review the IJ's decision directly because it is not considered a final order, and the Court could not review the BIA's initial decision because the petitioner filed his appeal more than eight months after the BIA's decision. Ultimately, the *Prekaj* Court held that it had jurisdiction over only the denial of the motion to reopen, and declined jurisdiction on the previous two issues. For the same reasons as in *Prekaj*, this Court declines to review the BIA's June 2, 2005 decision, and exercises jurisdiction over only the BIA's April 17, 2007 decision.

### III.    DISCUSSION

#### A.    Standard of Review

Ordinarily, an alien must file a motion to reopen within 90 days of the BIA's final order. In this case, Hanna failed to file his motion to reopen until nearly 17 months after the BIA's June 2, 2005 decision. However, regulations provide that the 90-day requirement does not apply to motions to reopen "based on changed circumstances arising in the country of nationality . . ., if such evidence is material and was not available and could not have been discovered or presented at the previous hearing." 8 C.F.R. § 1003.2(c)(3)(ii). Accordingly, Hanna's motion to reopen

was not time-barred because it specifically sought to reopen the proceedings based upon the changed circumstances of Iraq since the BIA's June 2, 2005 decision.

The BIA has "broad discretion" to grant or deny a motion to reopen. *I.N.S. v. Doherty*, 502 U.S. 314, 323 (1992). Accordingly, we apply the abuse of discretion standard to appeals of such BIA decisions. *Id.*; *Harchenko v. I.N.S.*, 379 F.3d 405, 409 (6th Cir. 2004). Furthermore, that standard applies "'regardless of the underlying basis of the alien's request [for relief].'" *Doherty*, 502 U.S. at 323 (quoting *I.N.S. v. Abudu*, 485 U.S. 94, 99 n.3 (1988)). In reviewing for abuse of discretion, this Court asks whether the denial of the motion to reopen "was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group." *Haddad v. Gonzales*, 437 F.3d 515, 517 (6th Cir. 2006) (quotation marks and citation omitted).

### B. Refugee Crisis in Iraq Act of 2007

At oral argument, Hanna's counsel mentioned for the first time a new statute enacted since Hanna filed this appeal. Consequently, this Court granted a request to file supplemental briefing regarding the new statute and its applicability to the instant case.

On January 28, 2008, the President signed into law the Refugee Crisis in Iraq Act of 2007.[5] The Act provides that "[r]efugees of special humanitarian concern eligible for Priority 2 processing under the refugee resettlement priority system who may apply directly to the United

---

[5] The Refugee Crisis in Iraq Act is found at Subtitle C, sections 1241-49 of the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3.

States Admission Program shall include . . . Iraqis who are members of a religious or minority community, have been identified by the Secretary of State, or the designee of the Secretary, as a persecuted group, and have close family members . . . in the United States."[6] More importantly, the Act provides a special ground and exception for filing a motion to reopen:

> An alien who applied for asylum or withholding of removal and whose claim was denied on or after March 1, 2003, by an asylum officer or an immigration judge solely, or in part, on the basis of changed country conditions may, notwithstanding any other provision of law, file a motion to reopen such claim in accordance with subparagraphs (A) and (B) of . . . 8 U.S.C. § 1229a(c)(7) not later than six months after the date of the enactment of the Refugee Crisis in Iraq Act if the alien--
> (1)  is a citizen or national of Iraq; and
> (2)  has remained in the United States since the date of such denial.

RCIA § 1247.[7] There is no dispute between the parties that Hanna satisfies the requirements of subparagraphs (1) and (2). But, ultimately, we need not decide the impact of this legislation in this appeal because, for the reasons stated below, we will remand the case to the BIA. This will give the BIA the opportunity to address to what extent the Act has any effect on Hanna's case.

---

[6] "Close family members" are statutorily defined, and include the "children . . . of a citizen of the United States," 8 U.S.C. § 1151(b)(2)(A)(i), and "brothers or sisters of citizens of the United States," 8 U.S.C. § 1153(a)). Ostensibly, Hanna would satisfy this requirement because both of his parents, as well as his sister, have been granted asylum and naturalized citizenship.

[7] 8 U.S.C. § 1229a(c)(7) essentially requires that "[t]he motion to reopen shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." This is the same standard that applied to Hanna's motion to reopen that is currently before this Court.

### C. The record does not permit a determination as to whether the BIA abused its discretion.

The BIA's decision is contained within one page, indeed one paragraph. The relevant

conclusions and rationale from the BIA are as follows:

> [W]e are not persuaded that the documents provided with the motion [to reopen] demonstrate that conditions for Chaldean Christians in Iraq worsened after the statutory and regulatory period provided for the filing of a motion, or since [Hanna's] hearing before the Immigration Judge. The recency of articles shows that some Chaldean Christians continue to be targeted in Iraq, but this evidence fails to illustrate a material change, it does not show that the respondent faces an individualized risk of persecution, and it does not show a pattern or practice of persecution of Chaldean Christians by the Iraqi government. *See generally Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006) (rejecting a pattern and practice claim because the general turmoil in Iraq makes it an unsafe and unpleasant place for the general population, not just Assyrian Christians, to live). The motion is denied.

(JA at 10.) In other words, the BIA's decision states that the motion is denied for three reasons,

either individually or in combination with each other: (1) the evidence that Chaldean Christians

presently are being persecuted in Iraq does not rise to the level of a material change since either

June 2005 or November 2003; (2) the evidence does not demonstrate that *Hanna* himself faces a

risk of persecution; and (3) the evidence does not demonstrate that the *Iraqi government* is

engaged in persecution of the Chaldean Christians.

Hanna's strongest argument for finding abuse of discretion relates to consistency among

three BIA decisions. Hanna cites the BIA's August 2006 decision *In re Pati*, in which it granted

a motion to reopen a decision denying asylum to the Iraqi Chaldean Christian applicants. (JA at 204.) In that decision granting the motion to reopen, the BIA declared that "[t]he motion is supported by updated evidence that we find is new and relevant to the worsening conditions in Iraq for Chaldean Christians." (*Id*.) In addition, Hanna cites another decision, *In re Balious*, in which the BIA in June 2006 granted a motion to reopen an Iraqi Chaldean Catholic's application for asylum. (JA at 207.) In that decision, the BIA explained that the "respondent has established through this objective evidence of record a prima facie case of eligibility for [asylum]" based upon "new evidence which indicates that the rise of Islamic fundamentalism since the fall of the prior regime has resulted in growing violence in which Christians are specifically targeted." (*Id*.)

While the BIA has broad discretion to grant or deny motions to reopen, it does not have the discretion to make such decisions arbitrarily. *Daneshvar v. Ashcroft*, 355 F.3d 615, 625-26 (6th Cir. 2004) ("The Board's discretion is broad but it is not unlimited. It may not exercise its discretion in a way that is arbitrary, irrational or contrary to law. Cursory, summary, or conclusory statements are inadequate."). Here, the BIA denied Hanna's motion to reopen in April 2007 with little more than a bald statement that it was "not persuaded" that "conditions for Chaldean Christians in Iraq worsened," (JA at 10), despite the fact that in June 2006 and August 2006, the BIA granted similar motions to reopen based upon evidence that *did persuade* the BIA that there are "worsening conditions in Iraq for Chaldean Christians," (JA at 204), and that there has been "growing violence in which Christians are specifically targeted," (JA at 207). In other words, the BIA has now held that between November 2004 and August 2006, conditions in Iraq for Chaldean Christians sufficiently worsened to merit reopening two cases (*In re Pati* and *In re*

- 11 -

*Balious*), but between June 2005 and April 2007, conditions had not sufficiently worsened to merit reopening Hanna's case. There is an overlap of about fourteen months between the two cases meriting reopening and Hanna's that did not merit reopening, yet the BIA provides insufficient reasoning for this Court to determine whether the BIA abused its discretion in Hanna's case.

This Court cannot engage in meaningful review of the BIA's decision if the Board neglects to give an adequate articulation of why it granted a motion to reopen in two cases, but denied it in a third that appears to be indistinguishable from the prior two.[8] Indeed, at oral argument, counsel for the Government readily acknowledged that "[y]ou certainly never want to have situations or you want to try to avoid situations where there's government inconsistencies." But counsel for the Government then explained that inconsistencies are "going to happen sometimes just because of the nature of asylum proceedings where people are in separate proceedings. If it's a false claim, one person might be more convincing."[9] That might very well be true, but in this situation, we are dealing with Board decisions that draw no distinctions that

---

[8] Regulations governing the BIA recognize a need for the BIA to maintain consistency among decisions of IJs. Specifically, 8 C.F.R. § 1003.1(e)(6)(i) provides that the BIA may refer a case to a three-member panel, rather than a single member, in cases that present the "need to settle inconsistencies among the rulings of different immigration judges."

[9] At oral argument, counsel for the Government also informed the Court that the Department of Homeland Security is currently removing people from the United States to only northern Iraq, not southern Iraq. That removal policy is based upon some other discretionary criteria independent of the administrative ruling that a person is removable to Iraq. While we applaud the Department's decision to remove people to the more stable and secure areas of Iraq, this other discretionary criteria only underscores our concern in this case that this case deserves a closer look by the BIA.

can be labeled alien-specific. As a result, we have a situation in which the risk to all the individuals involved is exactly the same: Christians in Iraq are persecuted on the basis of their religion.

Here, the Board failed to give a reason that removes this case from the shadow of *In re Pati* and *In re Balious*. There very well might be reasons relating to Hanna's case that justify the BIA's decision. Accordingly, we will remand this case to the BIA to explain its decision in Hanna's case in light of *In re Pati* and *In re Balious*, and any other facts or circumstances that the BIA deems relevant to its decision. We believe that the closeness of this case warrants a careful analysis by the BIA. Furthermore, this will also give the BIA the opportunity to consider the impact, if any, of the new Refugee Crisis in Iraq Act of 2007.

## IV. CONCLUSION

For the foregoing reasons, we REMAND the case to the BIA for an explanation addressing the concerns expressed in this Opinion.