RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GILBERTO PABLO LORENZO,

          *Petitioner*,

     *v*.

WILLIAM P. BARR, Attorney General,

          *Respondent*.

No. 18-3606

On Petition for Review from the Board of Immigration Appeals;
No. A 096 151 319.

Decided and Filed: July 9, 2019

Before: CLAY, GILMAN, and KETHLEDGE, Circuit Judges.

_____

### COUNSEL

**ON BRIEF:** Chelsea E. HaleyNelson, HALEYNELSON & HEILBRUN, LLP, Oakland, California, for Petitioner. Matthew B. George, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

     CLAY, J., delivered the opinion of the court in which GILMAN, J., joined. KETHLEDGE, J. (pg. 16), delivered a separate dissenting opinion.

_____

### OPINION

_____

     CLAY, Circuit Judge. Gilberto Pablo Lorenzo appeals the decision of the Board of Immigration Appeals ("BIA") denying his motion to reopen based on changed country conditions and ineffective assistance of counsel. We have jurisdiction over Pablo's appeal under 8 U.S.C. § 1252(a)(1). Because the BIA failed to properly evaluate Pablo's undisputed,

reasonably specific evidence, and because it applied the wrong legal standards with respect to his motion to reopen based on changed country conditions, we reverse and remand to the BIA to reconsider whether Pablo has demonstrated changed country conditions under the correct evidentiary and legal standards. However, we affirm the BIA's denial of Pablo's motion based on ineffective assistance of counsel because Pablo has failed to demonstrate that he acted with due diligence, as required to succeed on this claim.

## I. FACTUAL AND PROCEDURAL HISTORY[1]

Pablo was born in 1985 in Todos Santos Cuchumatan, a small town in the Huehuetenango province in the Western Highlands of Guatemala. An indigenous Guatemalan, Pablo speaks the Mam language and minimal Spanish. Pablo lived in Guatemala until August of 2001 when he fled to the United States after being violently abused by his stepfather.

Pablo settled with his brother in Grand Rapids, Michigan. A friend suggested that he see Lidia Marquez, who purportedly could help Pablo obtain papers that would enable him to remain in the United States. Lidia told Pablo that she could assist him, but not until Pablo sent her $500. Pablo did not understand much of what Lidia said because she only spoke Spanish, but Pablo trusted her and sent her the funds. Lidia helped Pablo prepare forms and, ultimately, obtain an interview with immigration officials, but said she could no longer assist Pablo after he received a letter requiring him to attend an immigration hearing in Detroit. Lidia told Pablo to obtain an attorney to represent him during the court proceeding.

Pablo then contacted "Elias," a purported attorney in Holland, Michigan, who had been recommended to Pablo by a friend. Elias stated that he was an attorney and charged Pablo $500 to represent him. Pablo's first court date was scheduled for early 2003 in Detroit. Elias failed to show up. The court did not have a Mam interpreter, and Pablo could not understand much of what the judge said. After the hearing, Pablo contacted Elias, who said he had been unable to

---

[1]The facts contained in this section are derived primarily from three declarations that Pablo submitted in support of his motion to reopen: (1) Pablo's own declaration; (2) the declaration filed by Pablo's current counsel, Chelsea HaleyNelson; and (3) the declaration filed by Alison Aparicio, M.S.W., the director of a Guatemalan organization that provides mental health services, advocacy, and other forms of assistance to indigenous workers. The government does not dispute the veracity of these declarations. We assume the accuracy of the factual allegations contained in these declarations for purposes of this opinion.

attend the hearing but that he could help Pablo if he paid an additional $1,500.  Pablo paid Elias the additional funds.  But Elias failed to show up to a subsequent hearing.  Nonetheless, Pablo continued to try to secure Elias's assistance and expected Elias to help him resolve his immigration case.

Pablo's final immigration hearing took place on February 23, 2005.  Elias again failed to show up.  Unbeknownst to Pablo, his immigration case had been joined with that of his brother, Jose, and his brother's partner, Florentina.  Florentina was represented by an attorney named David Koelsch.  Pablo did not know that Koelsch also represented him because Pablo had never met Koelsch, and Pablo continued to believe that Elias was his attorney.  During the hearing, Koelsch spoke with the judge, but Pablo did not understand the content of their discussion.  After the hearing, Jose informed Pablo that the judge had denied each of their applications for asylum.

A few months after the hearing, Pablo received a letter stating that his appeal had been denied.  Prior to receiving the letter, Pablo did not know that anyone had filed an appeal on his behalf.  Pablo attempted to contact Elias, but Elias did not answer his phone or return Pablo's calls.  Pablo spoke with his brother about contacting Koelsch, but his brother did not know where Koelsch was or how to contact him.  Pablo experienced fear and anxiety about his immigration status but did not know what to do or where to turn for help.

In January 2009, Pablo was stopped by the police for a traffic violation and subsequently deported to Guatemala.  Pablo went to live with his grandparents, indigenous farmers who owned a farm in the town of Todos Santos Cuchumatan.  Prior to Pablo's return, a group of people from the nearby town of Chiantla had beaten his grandparents and destroyed their crops.  In an attempt to stop the mistreatment, Pablo joined a land committee comprised of indigenous farmers and filed a report about the abuse with the mayor's office.  But the police supported the assailants who had attacked his grandparents.  On February 24, 2010, Pablo and a friend saw a police car and a group of people from Chiantla.  The group said Pablo was "going to pay" because he had reported them.  (Pablo Decl. at ¶ 29.)  They took Pablo and his friend to an isolated place and beat them until Pablo passed out.  They also threatened to kill Pablo if he continued to fight for indigenous farmers' land rights.  In April 2010, fearing that he would be

murdered by the group from Chiantla if he remained in Guatemala, Pablo fled to the United States.

When Pablo returned to the United States, he did not contact immigration officials, seek legal assistance, or otherwise attempt to address his immigration status. Pablo wanted to forget about the abuse that he had experienced in Guatemala, and he feared being removed again.

In September 2012, Pablo was again deported to Guatemala. This time, Pablo decided not to live with his grandparents because he feared further attacks and threats against his life. Instead, he settled in Guatemala's Southern Coast and found work on a farm called *La Nueva Esperanza*. The foremen were all "ladinos," i.e., non-indigenous Guatemalans, and they mistreated the farmers, most of whom, like Pablo, were indigenous. The foremen humiliated the indigenous workers, regularly calling them "stupid Indians" or "ignorant Indians." (*Id*. at ¶ 33.) They also beat the indigenous workers. Over time, this abuse intensified.

Pablo helped form a union of the indigenous farm workers to address the abuse by the ladino foremen at *La Nueva Esperanza*. In May 2014, the union, comprised of four indigenous farmers, approached the owner; they discussed the mistreatment of indigenous farmers and demanded that the owner instruct his subordinates to stop the abuse. The owner stated that he would not tolerate a union on his farm and warned that if Pablo and his companions continued advocating for the rights of indigenous farmers, he would summon the police to "show the Indians their place." (*Id*. at ¶ 34.)

The abuse of indigenous workers increased in severity. For example, in November 2014, the foremen accused an indigenous couple of not completing their work, and punished them by tying them to a post and brutally beating them with guns and sticks. Pablo and other workers attempted to intervene, but the farm owner's security officer warned Pablo that he would kill him if Pablo tried to stop the beating. The next day, Pablo took the couple to the hospital. Pablo reported the beating to a local "Peace Judge,"[2] who promised to speak to the owner but never did. When Pablo returned to the judge's office to inquire about why the judge had not spoken to

---

[2]A "peace judge," or *Juzgado de Paz*, "cover[s] cases in the absence of a higher judge[]." (Aparicio Decl. at 6.)

the owner, the judge's secretary said that the judge had more important things to do and dismissed Pablo and his fellow workers as "just simple Indians." (*Id*. at ¶ 37.)

Pablo helped form a larger group of indigenous farmers to protest the mistreatment by the foremen. On July 4, 2015, approximately 300 indigenous farm workers marched peacefully from *La Nueva Esperanza* to the center of Coatepeque, a nearby town. At approximately 2:30 pm, Guatemalan soldiers and National Police arrived and threw smoke bombs and water at the protesters. Pablo attempted to flee, but was apprehended by a group of soldiers and police. They forced Pablo into one of their trucks, where they pulled his hands behind his back and struck him repeatedly with their weapons while saying "Retarded Indian, this is what happens to you because you are protesting the farm owners." (*Id*.) They took Pablo to a jail, where they tied his hands behind his back, beat him, and repeatedly slammed his head against the floor. They beat Pablo so badly that he passed out.

The next day, a police officer entered Pablo's cell and announced that police in Huehuetenango—where Pablo had lived with his grandparents from 2010 to 2012 and where he had received death threats after reporting the mistreatment of his grandparents and other indigenous farmers—were looking for him. The officer informed Pablo that he would be sent to Huehuetenango, and that the local police there would decide whether he lived or died. But before Pablo was transported to Huehuetenango, someone from a human rights organization intervened and secured his release. As Pablo left the jail, a police officer told him that he would not be so lucky next time.

Pablo spent five days in the hospital recovering from the injuries that he sustained at the hands of the police. The hospital report states that Pablo was "in a state of shock, nervous, with an unbalanced sense of time and place," and that he was "[c]rying out from pain." (Hospital Report, AR at 183.) The report details Pablo's many injuries, such as "deep wounds on the right side of the jaw," "abrasions on the nose," "lacerations on the eyelids," "lacerated inner lips, bloody gums and lacerated tongue," "bruises and scratches" on the neck, injuries to the head including "polytrauma in the region occipital and multiple hematomas in the center of the skull and occipital," "a deep cut on the left elbow," "pectoral trauma and severe inflammation, with intense pain" and "multiple hematomas in the right ribcage," and "weapon marks with a large

caliber" on his back and shoulders. (*Id.*) The report concludes that Pablo's injuries were caused by "Torture, Trauma and Polytrauma in the head." (*Id.* at 185.)

After he was released from the hospital, Pablo "begged" his grandparents for money to "escape Guatemala." (Pablo Decl. at ¶ 40.) On September 10, 2015, Pablo returned to the United States. He settled in Oakland, California, where there is a large Mam population. Pablo began attending a church and, after he started to feel safe in that community, he told a fellow churchgoer about the abuse that he had experienced in Guatemala. This person referred Pablo to his current attorney.

Pablo first met with his current counsel in July 2016. Pablo did not have any records from his previous lawyers because none had ever been given to him. His current counsel conducted an investigation of Pablo's case by requesting information under the Freedom of Information Act and seeking records from governmental agencies. Current counsel began receiving responsive documents in August 2016, but did not receive a "comprehensive response" from the United States Citizenship and Immigration Service until early June of 2017. (HaleyNelson Decl. at ¶ 5.) On June 18, 2017, current counsel met with Pablo, reviewed with him the records she had received, discussed his relationships with his previous counsel, and explained that she believed that Pablo had received ineffective assistance from his prior "attorneys."

They began working on the motion to reopen. By late June, Pablo had filed complaints against Lidia, Elias, and Koelsch. On September 18, 2017, Pablo filed the motion to reopen. Pablo argued that the BIA should reopen his application for two reasons that are pertinent to this appeal.[3]

First, Pablo argued that changed country conditions warranted reopening his application. In support of this argument, Pablo submitted evidence detailing the escalating violence against indigenous farmers and land rights advocates in Guatemala since his hearing in 2005. For

---

[3]Pablo additionally argued below that the BIA should exercise its *sua sponte* authority to reopen his immigration proceedings. Pablo has not pursued this argument before this Court. Moreover, "the BIA's determination to forgo the exercise of its *sua sponte* authority is a decision that we are without jurisdiction to review." *Barry v. Mukasey*, 524 F.3d 721, 724 (6th Cir. 2008).

example, Pablo submitted his affidavit, in which he detailed how government forces detained him, beat him, and tortured him for peacefully protesting the mistreatment of indigenous farmers, and in which Pablo expressed his belief that, because police in Huehuetenango and Coatepeque have placed him on a list of indigenous activists, he is "not safe anywhere in Guatemala" and that the police "could find me and hurt me anywhere I go in Guatemala." (AR at 67–74.) Pablo also submitted the hospital report that details his gruesome injuries and corroborates his account of being tortured by the police; a certified report from the Office of Human Rights in Quetzaltenango, Guatemala, confirming that, on July 4, 2015, Pablo was violently detained, beaten, and tortured for peacefully protesting the abuse of farm workers; an affidavit from Juan Lopez, a fellow farmer and union member from *La Nueva Esperanza* who states that people are "searching for [Pablo]" and that Pablo "runs the risk of being killed in Guatemala" (AR at 188); the affidavit of Ms. Aparicio, who explained that persecution of indigenous land rights activists has risen "sharply" in the intervening years since Pablo's merits hearing (*see* Aparicio Decl. at 4); and many reports from news outlets and human rights organizations chronicling the increased violence against indigenous farmers and land rights advocates in Guatemala in recent years.

Second, Pablo argued that he received ineffective assistance of counsel in his original immigration proceeding. Pablo asserted that he neither knew, nor had reason to know, that previous counsel had been ineffective until he met with his current attorney.

The BIA denied Pablo's motion to reopen in a two-page opinion. This appeal followed.

## II. STANDARD OF REVIEW AND LEGAL PRINCIPLES

"We review the denial of a motion to reopen under the abuse-of-discretion standard." *Acquaah v. Holder*, 589 F.3d 332, 334 (6th Cir. 2009) (citing *Bi Feng Liu v. Holder*, 560 F.3d 485, 489 (6th Cir. 2009)). "We will find an abuse of discretion if the [BIA's] denial 'was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group.'" *Precetaj v. Sessions*, 907 F.3d 453, 457 (6th Cir. 2018) (quoting *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005)). "In determining whether the BIA abused its discretion, we look only at 'the basis articulated in the decision and [we] may not assume that the [BIA]

considered factors that it failed to mention in its opinion.'" *Trujillo Diaz v. Sessions*, 880 F.3d 244, 248 (6th Cir. 2018) (quoting *Daneshvar v. Ashcroft*, 355 F.3d 615, 626 (6th Cir. 2004)). We review the BIA's legal determinations *de novo*. *Acquaah*, 589 F.3d at 334 (citing *Allabani*, 402 F.3d at 675).

Generally, a petitioner must file a motion to reopen within 90 days of the final order of removal. 8 U.S.C. § 1229a(c)(7)(C)(i); 8 C.F.R. § 1003.2(c). We recognize two exceptions to the 90-day requirement. First, the 90-day window does not apply when the motion is "based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3); *see, e.g.*, *Trujillo Diaz*, 880 F.3d at 249. Second, under the doctrine of equitable tolling, we may "permit [an untimely] reopening when the alien demonstrates that she received ineffective assistance of counsel and was prejudiced thereby." *Mezo v. Holder*, 615 F.3d 616, 620 (6th Cir. 2010) (citing *Allabani*, 402 F.3d at 676); *see also Gordillo v. Holder*, 640 F.3d 700, 703 (6th Cir. 2011).

Pablo filed his motion to reopen long after the 90-day window expired. He argues that the BIA abused its discretion by finding that neither changed country conditions nor ineffective assistance of counsel excused his untimely motion. We will evaluate Pablo's arguments in turn.

## III. DISCUSSION

### A. The BIA Abused Its Discretion by Denying Pablo's Motion to Reopen Based on Changed Country Conditions

#### 1. Relevant Legal Principles

To satisfy the changed-country-conditions exception to the 90-day window for filing a motion to reopen, a petitioner "must show that conditions in the country to which [he] will be removed have materially changed, with evidence of such change being unavailable or unable to have been discovered at the previous proceeding." *Yu Yun Zhang v. Holder*, 702 F.3d 878, 880 (6th Cir. 2012) (citations omitted); *see* 8 U.S.C. § 1229a(c)(7)(C)(ii); 8 C.F.R. § 1003.2(c)(3). This inquiry entails "compar[ing] the evidence of country conditions submitted with the motion

[to reopen] to those that existed at the time of the merits hearing below." *Bi Feng Liu*, 560 F.3d at 491 (quoting Matter of S-Y-G, 24 I. & N. Dec. 247, 253 (B.I.A. 2007)). A petitioner must show changed country conditions, not merely changed personal circumstances. *Haddad v. Gonzales*, 437 F.3d 515, 517 (6th Cir. 2006). "If a country, for its own reasons, becomes more hostile towards an alien or his group, then changed country conditions may exist; but if an alien voluntarily becomes a member of an already-oppressed group, then he has simply altered his personal circumstances." *Tan Wu Zhang v. Holder*, 385 F. App'x 546, 547 (6th Cir. 2010) (citations omitted). However, "[p]ersonal conversion to a group does not foreclose the possibility that a country can 'for its own reasons, become[] more hostile towards an alien or his group' at the same time." *Yu Yun Zhang*, 702 F.3d at 880 (citing *Tan Wu Zhang*, 385 F. App'x at 547). Therefore, the fact that an applicant voluntarily joins a disfavored group does not preclude a finding of changed country conditions if the applicant presents evidence that persecution of that group has materially intensified since the applicant's previous proceeding. *Id.*

"The BIA's role in reviewing a motion to reopen is like a trial court's role in reviewing a motion for summary judgment." *Trujillo Diaz*, 880 F.3d at 252 (citing *Haftlang v. INS*, 790 F.2d 140, 143 (D.C. Cir. 1986)). Therefore, the BIA "must accept as true reasonably specific facts proffered by an alien in support of a motion to reopen unless it finds those facts to be inherently unbelievable." *Id.* (quoting *Haftlang*, 790 F.2d at 143). Accordingly, if the BIA fails to "explicitly find" that a declaration offered by a petitioner is "inherently unbelievable," it must "accept[] as true the facts contained in the declaration." *Id.* at 253.

## 2. Application to the Matter at Hand

The BIA abused its discretion in concluding that Pablo failed to establish changed country conditions for two reasons. First, the BIA failed to properly evaluate Pablo's evidence of changed country conditions under the applicable evidentiary standards as previously articulated by this Court. Second, the BIA applied the wrong legal standards when evaluating Pablo's claim. For these reasons, we will remand to the BIA to reconsider Pablo's changed-country-conditions claim under the appropriate evidentiary and legal standards.

The BIA failed to evaluate Pablo's evidence of changed country conditions under the appropriate standards as previously articulated by this Court.  We have explained that an alien may demonstrate changed country conditions by showing that a country has become "more hostile towards an alien or his group," *Tan Wu Zhang*, 385 F. App'x 547, or that persecution of his group has "escalated" since his original immigration proceeding, *Yu Yun Zhang*, 702 F.3d at 880.  Pablo submitted evidence that tends to demonstrate that Guatemala has become significantly more hostile towards indigenous land-rights activists, such as his affidavit stating that that government forces detained him, beat him, and tortured him for peacefully protesting the mistreatment of indigenous farmers and that police could locate and kill him if he were to return to Guatemala; the hospital report that details Pablo's gruesome injuries and corroborates his account of being tortured by the police; a certified report from the Office of Human Rights in Quetzaltenango, Guatemala, confirming that, on July 4, 2015, Pablo was violently detained, beaten, and tortured for peacefully protesting the abuse of farm workers; an affidavit from Juan Lopez, a fellow farmer and union organizer from *La Nueva Esperanza* who states that people are "searching for [Pablo]" and that Pablo "runs the risk of being killed in Guatemala" (AR at 188); the affidavit of Ms. Aparicio, who explained that persecution of indigenous land-rights activists has risen "sharply" in the intervening years since Pablo's merits hearing (*see* Aparicio Decl. at 4); and many reports from news outlets and human-rights organizations chronicling the increased violence against indigenous farmers and land-rights advocates in Guatemala in recent years.

The BIA was required to either "explicitly find" that these reasonably specific facts were "inherently unbelievable" or "accept" Pablo's facts "as true" because its role when considering a motion to reopen is similar to a trial court's at the summary judgment stage.  *Trujillo Diaz*, 880 F.3d at 253.  It did neither. Further, although Pablo submitted hundreds of pages of evidence in support of his motion to reopen based on changed country conditions, the BIA dismissed Pablo's evidence in a cursory three-paragraph discussion that failed to meaningfully discuss the voluminous evidence that Pablo had presented.  Because the BIA never found Pablo's reasonably specific facts "inherently unbelievable," yet failed to accept these facts as true, and because it failed to meaningfully review Pablo's extensive evidence of changed country conditions, its denial of Pablo's motion to reopen lacked a rational explanation and constituted an abuse of discretion. *See Precetaj*, 907 F.3d at 457.

The BIA also committed reversible legal error by applying incorrect legal standards in two respects. First, the BIA concluded that Pablo's voluntarily becoming a member of a targeted group—advocates for the rights of indigenous farmers—constitutes a change in personal circumstances that precludes Pablo from demonstrating changed country conditions. This conclusion ignores this Court's holding that "[p]ersonal conversion to a group does not foreclose the possibility that a country can 'for its own reasons, become[] more hostile towards an alien or his group' at the same time." *Yu Yun Zhang*, 702 F.3d at 880 (quoting *Tan Wu Zhang*, 385 F. App'x. at 547). If Pablo provided reasonably specific facts demonstrating that Guatemala has become increasingly hostile towards advocates for indigenous workers, the fact that Pablo joined that disfavored group would not necessarily preclude a finding that country conditions have changed. *Id.* The BIA erred to the extent it held otherwise.

Second, and relatedly, the BIA dismissed Pablo's changed-country-conditions argument because, as the BIA stated, "the indigenous population's troubles [in Guatemala] took root during the 1980's civil war," and the indigenous population has historically suffered discrimination and violence. (BIA Op. at 2.) But this finding ignores this Circuit's rule that changed country conditions can exist when persecution of an already-targeted group escalates. *See Yu Yun Zhang*, 702 F.3d at 880 (holding that an applicant may demonstrate changed country conditions by showing that a country has become "*more hostile* towards an alien or his group" (emphasis added)). The mere fact that the indigenous population of Guatemala has long faced some level of discrimination would not preclude Pablo from demonstrating changed country conditions if he shows that persecution of the indigenous population materially intensified since his merits hearing. *See Yu Yun Zhang*, 702 F.3d at 880; *Tan Wu Zhang*, 385 F. App'x at 547. The BIA thus erred by finding that the fact that indigenous Guatemalans have long faced discrimination categorically precludes Pablo from showing changed country conditions.

### 3. Summary

We take no position on whether Pablo will be able to successfully demonstrate changed country conditions on remand. Rather, we conclude only that the first time the BIA considered Pablo's motion to reopen based on changed country conditions, it failed to properly consider Pablo's evidence and applied the wrong legal standards. We therefore reverse and remand for

the BIA to reconsider Pablo's motion to reopen based on changed country conditions using the correct evidentiary and legal standards.

**B. The BIA Did Not Abuse Its Discretion by Denying Pablo's Motion to Reopen Based on Ineffective Assistance of Counsel**

### 1. Relevant Legal Principles

When an applicant alleges that he or she received ineffective assistance of counsel and suffered prejudice as a result, we may excuse an applicant's failure to file a motion to reopen within the 90-day window under the doctrine of equitable tolling. *Mezo*, 615 F.3d at 620 (citing *Allabani*, 402 F.3d at 676); *Gordillo*, 640 F.3d at 703. To determine whether equitable tolling applies, we consider five factors: "(1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim." *Mezo*, 615 F.3d at 620 (quoting *Barry v. Mukasey*, 524 F.3d 721, 724 (6th Cir. 2008)).

Whether the applicant has demonstrated due diligence is the central question in many motions to reopen. The same is true here. We have repeatedly held that "[d]ue diligence requires an alien to prove that the delay in filing the motion to reopen was due to 'an exceptional circumstance beyond his control.'" *Mezo*, 615 F.3d at 621 (quoting *Barry*, 524 F.3d at 724). Whether an applicant acted diligently "depends on all of the facts of the case, not just the chronological ones." *Gordillo*, 640 F.3d at 705 (explaining that "the mere passage of time— even a lot of time—before an alien files a motion to reopen does not necessarily mean she was not diligent").

### 2. Application to the Matter at Hand

Pablo did not exercise due diligence. Pablo learned that the BIA denied his appeal in 2005. Moreover, Pablo knew that there were problems with his immigration status when he was deported in January 2009 and again in September 2012. Yet Pablo did not contact an attorney, or otherwise attempt to address his immigration status whatsoever, until he contacted his current counsel in July 2016—approximately eleven years after he learned that the BIA denied his

appeal and approximately seven-and-a-half years after he was first deported. We have held that a petitioner failed to demonstrate due diligence by not inquiring about her immigration status for one year after learning that the BIA dismissed her appeal, *see Barry*, 524 F.3d at 725, by taking no action for approximately two years after becoming concerned about the status of his immigration case, *see Ly v. Holder*, 436 F. App'x 462, 465 (6th Cir. 2011), and by neglecting to inquire about the status of his BIA appeal for several years, *see Hermiz v. I.N.S.*, 86 F. App'x 44, 45 (6th Cir. 2003) (per curiam). Pablo failed to take any steps to address his immigration status for a longer period of time than the aliens in the cases cited above, and fails to adequately explain why he did not attempt to address his situation sooner. Therefore, the BIA did not abuse its discretion by concluding that Pablo did not act with due diligence. *See Barry*, 524 F.3d at 725; *Ly*, 436 F. App'x at 465; *Hermiz*, 86 F. App'x at 45.

Pablo argues that he acted with due diligence, but his argument misses the mark. Pablo asserts that he acted diligently from 2003 to 2005, i.e., during the period when he received representation from Lidia, Elias, and Koelsch, each of whom eventually became unreachable. Pablo also argues that he acted diligently upon discovering his prior attorneys' ineffectiveness in July of 2016 because, shortly after meeting with his current counsel, he gathered evidence, submitted complaints, and filed his motion to reopen. But Pablo fails to adequately explain why he took no action from 2005, when he learned that the BIA denied his appeal, Elias stopped returning his calls, and Koelsch disappeared, to July 2016, when he contacted his current counsel. Simply put, Pablo has failed to show how "exceptional circumstances beyond his control" prevented him from taking any action during this eleven-year period. *See Ly*, 436 F. App'x at 466; *see also Mezo*, 615 F.3d at 621 (quoting *Barry,* 524 F.3d at 724).

Pablo relies on *Gordillo*, 640 F.3d 700, to support his assertion that he acted with due diligence. But *Gordillo* is inapposite. In *Gordillo*, the petitioners' attorney did not inform them that the BIA denied their appeal. *Id.* at 701. When the petitioners eventually learned about the BIA's decision, they "lost faith" in their attorney and "sought out a second and then a third opinion as to whether they had any legal basis for relief." *Id.* at 702. Both attorneys said that they did not. *Id.* When federal agents apprehended one of the petitioners four years later, the petitioners consulted another attorney who advised them that their original attorney had provided

ineffective assistance.  *Id*.  We held that the petitioners had acted with reasonable diligence, explaining that once they had reason to believe that their first counsel had been ineffective by failing to inform them of the BIA's decision, they "took prompt action to pursue their rights, and only later gave up after repeatedly being told they did not have any."  *Id.* at 705.  Unlike the petitioners in *Gordillo*, who sought out a second and third opinion after they had reason to believe that their attorney was ineffective, Pablo failed to take any action whatsoever when he had reason to believe that his prior counsel had rendered ineffective assistance; that is, when Elias and Koelsch became unresponsive and when he later learned that the BIA had denied his appeal.

Pablo also argues that the BIA erroneously found that he had failed to substantially comply with the requirements for a motion to reopen, as articulated in *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988).  Pablo correctly observes that the BIA made multiple errors in this regard.  First, the BIA faulted Pablo for failing to submit copies of the agreements he had with his previous attorneys.  But *Lozada* requires only that an applicant provide "an affidavit . . . setting forth in detail the agreement that was entered into with counsel . . . ."  *Id.* at 639. Pablo satisfied this requirement; his affidavit details his communications with counsel and his understanding of the agreements he had with each of his prior attorneys.  In addition, the BIA erroneously found that Pablo failed to notify his previous attorneys of his ineffective-assistance-of-counsel claim.  But Pablo filed formal complaints against his previous attorneys with the relevant bar disciplinary authorities.  The BIA's statement that Pablo failed to notify his prior attorneys is factually incorrect.

However, the BIA's errors concerning *Lozada* are immaterial.  It is undisputed that Pablo failed to file his motion within the 90-day window.  Therefore, he must first satisfy the requirements of equitable tolling before his compliance with *Lozada* becomes relevant.  *See Mezo*, 615 F.3d at 620. This, in turn, requires demonstrating due diligence.  *Id.* at 621; *Gordillo*, 640 F.3d at 705.  Because the BIA did not abuse its discretion by concluding that Pablo failed to act with due diligence, its incorrect interpretation of *Lozada* and erroneous statements about Pablo's compliance with *Lozada*'s requirements are harmless.

**3. Summary**

The BIA did not abuse its discretion by denying Pablo's motion to reopen based on ineffective assistance of counsel. The BIA properly found that that Pablo did not act with due diligence, as is required to toll the 90-day window based on ineffective assistance of counsel. Therefore, we affirm the BIA's denial of Pablo's motion to reopen based on ineffective assistance of counsel.

## IV. CONCLUSION

For the reasons stated above, we reverse and remand the BIA's decision with respect to Pablo's motion to reopen based on changed country conditions. We affirm the BIA's decision with respect to Pablo's motion to reopen based on ineffective assistance of counsel.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

KETHLEDGE, Circuit Judge, dissenting. I respectfully disagree with the majority opinion's characterization of the Board's opinion. The Board did not reject Pablo's alleged facts; instead, it held that those facts did not show that "conditions ha[d] materially changed in Guatemala since his hearing for purposes of 8 C.F.R. § 1003.2(c)(3)(ii)." *See* AR 4; *see also* 8 U.S.C. § 1229a(c)(7)(C)(ii) (authorizing reopening of a proceeding only if the "evidence is material"). That holding is an entirely "rational explanation" for the Board's denial of Pablo's motion to reopen. *See Yu Yun Zhang v. Holder*, 702 F.3d 878, 879 (6th Cir. 2012). I would therefore deny Pablo's petition.